Filed 6/23/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| STEWART ENTERPRISES, INC., et al.,<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>CITY OF OAKLAND et al.,<br><br>    Defendants and Appellants. | A143417<br><br>(Alameda County<br>Super. Ct. No. RG12646176) |

In May 2012, Stewart Enterprises, Inc. and SE Combined Services of California, Inc. (collectively, Stewart) obtained a building permit to construct a crematorium on a site in East Oakland. Five days later, the Oakland City Council (City Council) passed an emergency ordinance requiring a conditional use permit (CUP) to operate new crematoria. Stewart administratively appealed a determination that the emergency ordinance applied to its proposed crematorium, but Oakland's Planning Commission (Planning Commission) denied the appeal. Stewart then brought this action, which included administrative-mandamus claims, against the City of Oakland, the City Council, and the Planning Commission (collectively, the City).

The trial court granted one of Stewart's claims petitioning for writ of administrative mandamus, ruling that Stewart had a vested right in the building permit based on a preexisting local ordinance and that the emergency ordinance was not sufficiently necessary to the public welfare to justify an impairment of that right. On appeal, the City argues that (1) Stewart had no vested right; (2) even if Stewart had a vested right, it was not impaired; and (3) even if Stewart had a vested right that was

1

impaired, the impairment was supported by substantial evidence. We are not persuaded by these arguments and affirm.[1]

I.
FACTUAL AND PROCEDURAL
BACKGROUND

In 2011, Stewart began the process of obtaining approval to operate a crematorium at 9850 Kitty Lane in East Oakland. The Kitty Lane property was in an area zoned as Commercial Industrial Mix 2 (CIX-2).[2] A CUP was required for "extensive impact" civic activities in the CIX-2 zone, but "general manufacturing" was permitted so long as it was not within 300 feet of a residential zone. (Capitalization omitted.) At the time, Oakland Municipal Code (OMC) section 17.10.240(B) defined extensive impact civic activities to include "[c]emeteries, mausoleums, and columbariums," but the category did not expressly include crematoria.

Stewart obtained a zoning clearance after City staff determined that the proposed crematorium was a permissible general manufacturing use in the CIX-2 zone. In November 2011, BAAQMD granted Stewart authority to construct the crematorium. In its risk assessment, BAAQMD deemed the health "risk levels . . . acceptable" and recommended that Stewart follow certain measures to avoid triggering more stringent requirements, including limiting cremations to 3,000 bodies annually.

Stewart purchased the Kitty Lane property in January 2012 and took additional steps toward opening a crematorium, representing a total investment of about two million

---

[1] As a result, we need not consider Stewart's alternative arguments for affirming the judgment, including its contention that the emergency ordinance, by its own terms, exempts rights that vest under a local ordinance.

[2] In its brief, Stewart cites various documents that the trial court did not have before it when ruling: staff reports that accompanied ordinances involving the CIX-2 zone, which the court declined to take judicial notice of, emails between City Council members' staff and others, which the court declined to augment the administrative record with, and a mission statement of the Bay Area Air Quality Management District (BAAQMD), which was never submitted for the court's consideration below. Because these documents are unnecessary to our disposition, we need not address Stewart's arguments that we may properly consider them.

dollars. On May 10, 2012, Stewart obtained a building permit to make structural improvements and install a crematorium. At the time the permit was issued, former OMC section 17.102.040(A) (the permit-vesting ordinance) provided in relevant part, "Whenever any subsisting building permit . . . has been lawfully issued beforehand, . . . neither the original adoption of the zoning regulations nor the adoption of any subsequent rezoning or other amendment thereto shall prohibit the construction, other development or change, or use authorized by said permit[.]"[3]

Meanwhile, Stewart's plan to operate a crematorium had raised concerns in the surrounding community, and these concerns were brought to the attention of the City Council president. In early May 2012, a draft "interim ordinance" was filed that required a CUP for new crematorium activity. (Capitalization and boldface omitted.) On May 15, after the draft ordinance was revised to become an "emergency ordinance," the City Council held a public hearing to consider its adoption. (Capitalization and boldface omitted.) At the hearing, community members and representatives from an environmental organization expressed concern about the crematorium's potential negative impact on public health and business development in East Oakland. They supported a CUP requirement to permit the public to obtain additional information and to have further input before the crematorium was built.

Written materials were also presented for the City Council's consideration. The Alameda County Public Health Department (PHD) submitted a letter expressing its support for a CUP requirement. The PHD noted both the "potential health impacts" of crematoria generally and its "understand[ing]" that the planned crematorium in particular would "emit a range of pollutants," citing a report prepared by BAAQMD before it cleared Stewart to build. After pointing to the high rates of asthma in East Oakland, the PHD concluded, "Given the existing disproportionate burden of disease, a public process is necessary to protect community health." In addition, a petition signed by dozens of community members "ask[ed] that the City of Oakland refuse to rubber-stamp the

---

[3] OMC section 17.102.040 was repealed in 2013. (Oakland Ord. No. 13172, § 3.)

application for a crematorium . . . at 9850 Kitty Lane" so that they could first be provided with "a full explanation of the environmental and health impacts a crematorium would have . . . and an opportunity for [their] concerns to be heard and addressed."

At the hearing's conclusion, the City Council adopted the emergency ordinance. Under section 3 of the emergency ordinance, "[c]rematoriums or existing crematoria uses expanded shall only be permitted upon the granting of a major conditional use permit pursuant to the conditional use permit procedure in Chapter 17.134 of the Planning Code." Under section 4, "[n]o building, zoning or other permit that has been issued for any building or structure for which rights to proceed with said building or structure have not yet vested pursuant to the provisions of State law shall proceed without complying with this ordinance."[4] As required for emergency ordinances under Oakland City Charter section 213, the ordinance contained a recital that it was "necessary to preserve the public peace, health, welfare or safety and to avoid a direct threat to the health, safety, and welfare of the community," based on its other recitals that (1) "crematoria emit particulate matter and other toxic pollutants" and "the possibility of trucking many thousands of bodies into Oakland from the Bay Area and beyond would add to those emissions, increase traffic congestion, and tax Oakland's infrastructure"; (2) "the Airport Area Gateway is a recently revitalized corridor, [and] a regional cremation center [could] displace retail activities and compromise the economic opportunities of the Airport Area Gateway plan"; and (3) "[a] [r]egional cremation center in Oakland would impact the total environment of our neighborhoods and backslide efforts to address the cumulative impacts of environmental inequalities in less than fortunate areas of Oakland."

The day after the City Council hearing, the Oakland Planning & Zoning Director sent Stewart a letter informing it that the emergency ordinance applied to crematorium activity at the Kitty Lane property. The letter told Stewart that "[a]s a result, [it could] not proceed with any development or establishment of a Crematorium in reliance on the

---

[4] In 2014, the City Council adopted permanent regulations for crematoria, including them in the same category of "extensive impact civic activities" as cemeteries, mausoleums, and columbaria.

4

building permit or otherwise" without first obtaining a CUP.  Stewart appealed this determination to the Planning Commission.

In August 2012, the Planning Commission held a public hearing on Stewart's appeal.  At the hearing, several community members again voiced concerns about the impact on public health and businesses, and they reiterated their position that a CUP requirement was necessary to allow for adequate public input before the crematorium was built.  In addition, community members submitted hundreds of form letters asking the Planning Commission to deny the appeal based on similar concerns.  The Planning Commission also heard from a local business association, which advocated for a CUP based on the public's need to participate in the process and obtain "critical information about the facility, including the effects it may have on the environment, public health, and the local economy."  In addition, the PHD submitted a letter that was substantially the same as the one it had previously submitted to the City Council.  The Planning Commission denied Stewart's appeal by a vote of three to two.

Stewart then brought this lawsuit, alleging 11 causes of action.  Among them were two causes of action petitioning for administrative mandamus on the grounds that the Planning Commission's application of the emergency ordinance impaired a vested right of Stewart's under either the permit-vesting ordinance or state law, and four causes of action petitioning for traditional mandamus to set aside the emergency ordinance based on various theories of its invalidity.  The trial court sustained the City's demurrer to the cause of action alleging that Stewart had a vested right under state law, as well as to some of the other non-mandamus claims that are not relevant to this appeal.  The parties agreed to litigate the five remaining mandamus claims and postpone consideration of the other surviving causes of action.

In August 2013, after the parties briefed the mandamus claims and a hearing was held, the trial court granted Stewart's claim petitioning for a writ of administrative mandamus based on a vested right under the permit-vesting ordinance.  The court determined that the permit-vesting ordinance conferred a vested right on Stewart, that this right was impaired by the application of the emergency ordinance to Stewart's project,

5

and that the City had failed to identify sufficient evidence of "an urgent threat to the public welfare justifying the abrogation of vested rights." Stewart was therefore entitled to a writ compelling the Planning Commission to vacate its denial of Stewart's administrative appeal and "to enter an order sustaining the appeal and concluding that, under [the permit-vesting ordinance], Stewart's previously issued building permit [was] not subject to the [emergency ordinance]." The court denied the traditional mandamus claims without prejudice, finding their resolution unnecessary "[b]ecause the writ of administrative mandamus [would] afford Stewart the relief it seeks." Over a year later, after Stewart eventually dismissed the remaining unresolved claims, the court entered judgment and the writ was issued.

## II.
### DISCUSSION

In its claim petitioning for administrative mandamus based on the permit-vesting ordinance, Stewart sought to overturn the Planning Commission's decision to apply the emergency ordinance to the proposed crematorium as a "prejudicial abuse of discretion" under Code of Civil Procedure section 1094.5, subdivision (b).[5] "Abuse of discretion is established if the [agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (§ 1094.5, subd. (b).) Among other arguments, Stewart contended that the application of the emergency ordinance was an abuse of discretion because it violated Stewart's vested right under the permit-vesting ordinance.

"Governmental agencies may generally apply new laws retroactively where such an intent is apparent. [Citation.] Retrospective application may be unconstitutional, however, if it deprives a person of a vested right without due process of law." (*Davidson v. County of San Diego* (1996) 49 Cal.App.4th 639, 646 (*Davidson*).) *Davidson* is the primary decision guiding our analysis, as it is factually similar and provides a framework for determining whether a new enactment may constitutionally deprive a party of a vested right conferred by a local ordinance.

---

[5] All further statutory references are to the Code of Civil Procedure.

6

In *Davidson*, *supra*, 49 Cal.App.4th 639, a county zoning ordinance provided that any permit application needed to comply with only the zoning regulations " 'that were in effect on the date that application was filed.' " (*Id.* at pp. 642-643.) The plaintiff filed an application to build a crematorium at a time when doing so "required only site plan approval and a building permit." (*Id.* at p. 643.) About two weeks later, the county board of supervisors "enacted a provision requiring a major use permit for a crematorium" in the applicable zone and "refused to process [the plaintiff's] permit application until he applied for and received a major use permit." (*Id.* at pp. 643-644.) The Court of Appeal held that the earlier ordinance conferred on the plaintiff a "vested right to have [his] building permit application reviewed and considered in light of the regulations existing on the date of the application." (*Id.* at p. 648.) The county could constitutionally impair that right if "the new regulations imposed . . . on [the plaintiff's] project were ' " 'sufficiently necessary to the public welfare as to justify the impairment,' " ' " however, and the case was remanded for the trial court to consider that issue. (*Id.* at pp. 649-650.)

Consistent with *Davidson*, *supra*, 49 Cal.App.4th 639, we must resolve three issues here: (1) whether Stewart had a vested right in the building permit under the permit-vesting ordinance; (2) if so, whether the emergency ordinance impaired that right; and (3) if there was a vested right that was impaired, whether the impairment was justified because it was sufficiently necessary to the public welfare.

A. *Stewart Had a Vested Right in the Building Permit Under the Permit-Vesting Ordinance.*

The City first argues that the requirement of a CUP for new crematoria imposed by the emergency ordinance trumped any right the permit-vesting ordinance may have otherwise conveyed. We disagree.

Whether Stewart had a vested right under the permit-vesting ordinance is a question of statutory interpretation we review de novo. (*T & A Drolapas & Sons, LP v. San Francisco Residential Rent Stabilization & Arbitration Bd.* (2015) 238 Cal.App.4th 646, 651; *Cassidy v. California Bd. of Accountancy* (2013) 220 Cal.App.4th 620, 627.)

7

We therefore turn to the applicable law. As *Davidson*, *supra*, 49 Cal.App.4th 639 explains, there are various bases for finding a vested right. First, under the judicial vested-rights doctrine, a party acquires a vested right in a building permit if the party " 'has performed substantial work and incurred substantial liabilities in good faith reliance upon a permit issued by the government.' " (*Id.* at p. 646, quoting *Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785, 791.) Second, certain state statutes confer vested rights based on development agreements and vesting tentative maps. (*Davidson*, at pp. 646-647.) Finally, "[l]ocal ordinances may . . . confer vested rights earlier than available under the judicial doctrine." (*Id.* at p. 647.) As Stewart essentially concedes, the permit-vesting ordinance provides the only potential basis for finding a vested right here.

The City relies on various canons of statutory interpretation and cases supporting its general authority to impose a CUP requirement and override preexisting legislation through an emergency ordinance in arguing that the emergency ordinance here "controls" over the permit-vesting ordinance. These arguments are misdirected. The determination whether Stewart had a vested right in the building permit "is not made by looking at the effect of the [City's] subsequent enactments but is made as of the time" Stewart obtained the permit. (*Davidson*, *supra*, 49 Cal.App.4th at pp. 647-648.) And under its plain terms, the permit-vesting ordinance conveyed a vested right because it shielded the holder of a lawfully issued building permit from having to comply with any subsequently adopted zoning regulations if such regulations would "prohibit the construction . . . authorized by said permit." (See *id.* at p. 648 ["clear language" of ordinance "show[ed] it was intended to confer the vested right to have a building permit application reviewed and considered in light of the regulations existing on the date of the application"].) Even if we assume, as the City argues, that the emergency ordinance was lawfully passed and the City Council intended it to override the permit-vesting ordinance, the City offers no argument as to why the permit-vesting ordinance failed to confer a vested right on Stewart when Stewart obtained the building permit. We agree with Stewart that, based on the permit-

8

vesting ordinance, it had a vested right to construct the crematorium as authorized by the permit.

### B. *The Emergency Ordinance's Application to the Proposed Crematorium Impaired Stewart's Vested Right.*

The City next claims that even if Stewart had a vested right in the building permit, the application of the emergency ordinance to the project did not impair that right because requiring a CUP did not amount to "prohibiting" the crematorium's construction. We are not persuaded.

We review de novo the meaning of the permit-vesting ordinance. (*T & A Drolapas & Sons, LP v. San Francisco Residential Rent Stabilization & Arbitration Bd.*, *supra*, 238 Cal.App.4th at p. 651; *Cassidy v. California Bd. of Accountancy*, *supra*, 220 Cal.App.4th at p. 627.) In doing so, " 'we use the same rules applicable to statutes.' " (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1183-1184.) Under those rules, " '[o]ur fundamental task . . . is to determine the [legislative] intent so as to effectuate the [ordinance's] purpose.' " (*Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 582.) We begin by " 'examin[ing] the statutory language, giving it a plain and commonsense meaning. . . . If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd, [unintended] consequences[.]' " (*Ibid.*)

The City argues that the application of the emergency ordinance to Stewart's project impaired no vested right conferred by the permit-vesting ordinance because the latter ordinance only "proscribed the application of legislation to 'prohibit' a project, whereas the [emergency ordinance] imposed [a] CUP requirement." Reasoning that the emergency ordinance merely "require[d] further discretionary review" instead of outright "prohibiting" the construction of a crematorium, the City concludes that the permit-vesting ordinance was "inapplicable." The trial court rejected this position, stating, "To impose a condition on a building permit is to prohibit the project until the property owner satisfies the condition. If the condition were one that the property owner could unquestionably satisfy by unilateral action, without requiring the public entity's

9

discretionary approval, the analysis might differ. Here, however, an application for a CUP can be denied. Such a denial would plainly 'prohibit' Stewart from completing 'the construction . . . or use authorized by [the] permit.' "

We agree with the trial court's reasoning. To "prohibit" is defined as "[t]o forbid by law" or "[t]o prevent or hinder." (Black's Law Dict. (8th ed. 2004) p. 1248, col. 1.) Under either definition, the emergency ordinance "prohibited" the construction of a crematorium as authorized by Stewart's building permit. Once the emergency ordinance was applied to the project, Stewart was no longer allowed to build the crematorium because it did not have a CUP. The possibility that Stewart could regain the right to build the crematorium if it applied for and was granted a CUP does not change this fact: a project can be "prohibited" even if the fulfillment of certain contingencies might at some later date reauthorize it. Therefore, we conclude that the application of the emergency ordinance impaired Stewart's vested right under the permit-vesting ordinance to build the crematorium.

C.  *The Record Lacks Evidence that the Impairment of Stewart's Vested Right Was Sufficiently Necessary to the Public Welfare.*

Finally, the City contends that the impairment of Stewart's vested right by the emergency ordinance was justified because the impairment was sufficiently necessary to the public welfare. Again, we disagree.

1.  The trial court's standards of review.

The City first argues that the trial court used incorrect standards of review in evaluating whether the emergency ordinance was sufficiently necessary to the public welfare to justify the impairment of Stewart's vested right. We conclude otherwise.

The trial court reasoned that the question " 'whether the new regulation[] imposed . . . on [the vested right-holder]'s project [was] " ' "sufficiently necessary to the public welfare as to justify the impairment" ' " ['] " was "one of law that a court reviews de novo, as it essentially involves an evaluation in light of due process principles of the justification for a legislative enactment." (Quoting *Davidson*, *supra*, 49 Cal.App.4th at p. 649.) To resolve that question, the court also considered "whether evidence in the

10

record support[ed] a finding that the [emergency ordinance] was necessary to address 'a menace to the public health and safety or a public nuisance' " and concluded that the City had not identified any evidence of "an actual threat to public health and safety." (Quoting *Davidson*, at p. 649.) This approach was entirely proper.

As we previously mentioned, an abuse of discretion under section 1094.5 exists if an agency "has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (§ 1094.5, subd. (b).) Generally, whether an agency has proceeded lawfully is a legal question that the trial court and appellate court both review de novo. (*Duncan v. Department of Personnel Administration* (2000) 77 Cal.App.4th 1166, 1173-1174.) We agree with the trial court that the particular issue here—whether the emergency ordinance was sufficiently necessary to the public welfare to justify the impairment of a vested right—is a question of law and thus subject to de novo review. (See *Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1128-1130 [discussing standard of review applicable to issue whether the impairment of vested contractual right was constitutional].)

"However, this does not mean that . . . de novo review [applies] to all factual findings underlying" the asserted justification for the impairment of Stewart's vested right. (*Board of Administration v. Wilson*, *supra*, 52 Cal.App.4th at pp. 1129-1130.) To the extent the Planning Commission's decision rested on a determination of historical facts involving the crematorium's potential impact on the public welfare, a separate standard of review also applied. (See § 1094.5, subd. (c); see also *Wilson*, at pp. 1129-1130.) We will assume, without deciding, that the City is correct that the trial court was required to apply the substantial-evidence standard in reviewing the Planning Commission's factual findings, as opposed to the less deferential "independent judgment" standard that sometimes applies under section 1094.5. (§ 1094.5, subd. (c); see *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 816, fn. 8.)[6]

---

[6] In turn, on appeal we stand in the trial court's shoes and also review the Planning Commission's factual findings for substantial evidence. (*Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1212.)

11

The trial court's approach was consistent with these standards. First, the trial court determined that the emergency ordinance's impairment of Stewart's vested right was not justified unless the ordinance "involve[d] an extraordinary exercise of [the City's] police power required to address 'a menace to the public health and safety or a public nuisance,' as opposed to an 'ordinary police power regulation[]' of the sort to which a vested right is 'immune.' " (Quoting *Davidson*, *supra*, 49 Cal.App.4th at p. 649.) Then, it concluded that there was no evidence in the record of any threat to the public welfare that was serious enough to satisfy this legal standard. In doing so, the court did not reweigh the evidence, specifically noting that it was not applying the independent judgment standard of review. Instead, it concluded that the evidence revealed merely "[a] desire for transparency and public participation" and "speculation that [the] project might conceivably affect public health" that together were, as a matter of law, insufficient to justify the impairment of Stewart's vested right.

In contending that the trial court applied the wrong standards of review, the City incorrectly assumes that the question whether an impairment of Stewart's vested right was justified is a factual issue and equates the de novo standard of review applicable to questions of law with the independent judgment standard under section 1094.5, subdivision (c) that is sometimes applicable to an agency's factual findings. But as explained above, the issue whether the impairment was justified was ultimately a legal issue the court correctly reviewed de novo, and the court made clear it was not applying the independent judgment standard to any factual issues. The City therefore fails to convince us that the court's approach was erroneous.

2.      The record lacks evidence of any sufficiently adverse impact on the public welfare to justify the impairment of Stewart's vested right.

The City next argues that "substantial evidence of negative impacts to the environment, public health[,] and businesses" justified the impairment of Stewart's vested right. It relies on numerous items, including the PHD letters, statements made at both hearings, the public's letters and petitions, and concerns expressed by local

12

businesses.  As did the trial court, we conclude that none of this evidence establishes a sufficient threat to the public welfare.

The City relies on a number of cases that "upheld local agency land use decisions based on liberal and broad interpretations of what constitutes substantial evidence of impacts to public welfare."  For example, *Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330 affirmed a county's denial of an application for a permit to build an addition to a single-family home.  (*Id.* at p. 332.)  Observing that "the concept of public welfare encompasses a broad range of factors, including aesthetic values as well as monetary and physical ones, and that a concern for aesthetics and 'character' is a legitimate governmental objective," the court held that neighbors' concerns about "traffic, parking, safety, noise and nuisance problems" was sufficient evidence to support the county's finding that the addition would threaten the public welfare.  (*Id.* at pp. 337-338.)  Similarly, *Harris v. City of Costa Mesa* (1994) 25 Cal.App.4th 963 held that there was substantial evidence to justify the denial of a CUP to build a second unit for a residence where neighbors objected that the unit would invade their privacy and was incompatible with the neighborhood's character.  (*Id.* at pp. 965-966, 973-974.)

We agree with the City that, as a general principle, "the public welfare" is an expansive concept.  None of the cases the City cites, however, involved the impairment of a vested right.  Where the issue is whether such impairment is sufficiently necessary to be constitutional, it is not enough to identify evidence of an impact on some aspect, no matter how minor, of the public welfare.  As *Davidson* explained, "The vested rights doctrine in the land use context 'is subject . . . to the qualification that such a vested right, while immune from divestment through ordinary police power regulations, may be impaired or revoked if the use authorized or conducted thereunder constitutes *a menace to the public health and safety or a public nuisance*.' "  (*Davidson*, *supra*, 49 Cal.App.4th at p. 649, some italics omitted.)  Thus, "[t]he usual exercises of police power in the land use context"—akin to those at issue in *Harris v. City of Costa Mesa*, *supra*, 25 Cal.App.4th 963, *Desmond v. County of Contra Costa*, *supra*, 21 Cal.App.4th 330, and cases like them—do not justify the impairment of a vested right because they "are not

13

directly related to danger or potential danger to the health and safety of the public."
(*Davidson*, at pp. 649-650.) Although such regulations are arguably justified by the
public welfare in its broader sense, *Davidson* establishes that only regulations
"reasonably necessary to prevent . . . a danger or nuisance to the public" justify the
impairment of a vested right. (*Id.* at p. 650.)

The City reads *Davidson* differently, contending that although that decision "cited
a case which had suggested the relevant inquiry was whether impairment of a vested right
was necessary to prevent ' "a menace to the public health and safety or a public
nuisance," ' " it "did not apply this heightened 'menace' standard" but instead applied the
" ' "sufficiently necessary to the public welfare" ' " standard. (Quoting *Davidson*, *supra*,
49 Cal.App.4th at p. 649.) We disagree with the City's interpretation of *Davidson*. As
discussed above, *Davidson* clearly distinguished between more pedestrian public-welfare
concerns that justify normal regulations and the threats to the public safety or health
required to justify the impairment of vested rights. *Davidson*'s language about danger to
the public health or safety does not establish a separate standard but is rather an
explanation of what "sufficiently necessary to the public welfare" means in this context.
Consistent with *Davidson*, the trial court determined that the evidence of the public's
"desire for transparency and . . . participation" "would easily afford a rational basis for an
ordinance applicable to proposed projects" if no vested right were implicated, but it did
not constitute "actual evidence" of an effect on the public health or any other sufficiently
serious impact on the public welfare necessary to impair a vested right.

We agree with the trial court's assessment of the record. The vast majority of the
evidence the City cites establishes there were concerns about what impacts the
crematorium *might* have on the public and local businesses. Indeed, in advocating for a
CUP requirement many community members explicitly relied on their desire to get more
information about the crematorium before it was built. But although the record is full of
statements about which chemicals crematoria in general can emit and the public-health
problems, particularly asthma, that East Oakland residents face, there is no evidence that
Stewart's crematorium in particular posed a danger to public health. If anything, the

14

BAAQMD risk assessment and approval of construction strongly suggest otherwise. Similarly, even if we assume that a threat to an area's businesses might otherwise justify the impairment of a vested right, the record reveals concerns that the crematorium might negatively impact businesses in the area but fails to disclose evidence of any actual economic threat. Therefore, we conclude there was insufficient evidence of a danger or nuisance to the public that justified the City's application of the emergency ordinance to Stewart's project.

## III.
### DISPOSITION

The judgment is affirmed. Respondents are awarded their costs on appeal.


_____
Humes, P.J.


We concur:


_____
Margulies, J.


_____
Dondero, J.

Counsel for Appellants:                  BURKE, WILLIAMS & SORENSEN
Kevin D. Siegel

Barbara J. Parker
City Attorney

Heather B. Lee
Deputy City Attorney

Counsel for Respondents:              WENDEL, ROSEN, BLACK & DEAN
Les A. Hausrath and Todd A. Williams

Trial Court:                              Alameda County Superior Court

Trial Judge:                             Honorable Evelio Grillo