Filed 8/29/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PAUL G. ATTARD et al., <br><br>　　　Plaintiffs and Appellants, <br><br>v. <br><br>BOARD OF SUPERVISORS OF CONTRA COSTA COUNTY et al., <br><br>　　　Defendants and Respondents. | A138702 <br><br> (Contra Costa County <br> Super. Ct. No. N10-0835) |

　　　The plaintiffs in this action, Paul and Tamara Attard (Attards), formulated a creative solution to circumstances constraining development on their two properties in Contra Costa County (County), but they failed to obtain the necessary regulatory approvals for their plan. Notwithstanding that failure, the county issued them permits to develop the properties, including a permit for construction of an 8400-square foot home. By the time the county discovered its error and notified the Attards, they had made substantial progress toward installing a foundation for the new home on one of the properties. The county nonetheless revoked the permits, a decision that was affirmed by the county Board of Supervisors (Board).

　　　The Attards filed a petition for writ of mandate challenging the revocation. In the petition, they contended the County was precluded from revoking their permits under the doctrines of vested rights and equitable estoppel. In addition, they contended they were exempt from local regulatory authority under the doctrine of sovereign immunity and were denied due process by the evident bias of one Board member. The trial court denied the writ petition, and we affirm that decision.

1

I  BACKGROUND

The Attards are the owners of an undeveloped 5-acre parcel at 1000 Fish Ranch Road in an unincorporated portion of the County (Fish Ranch Road property). The Fish Ranch Road property is located on the north side of Highway 24, near the east portal of the Caldecott Tunnel (the tunnel), approximately one mile west of the urban limit line of the Town of Orinda. Although the property is designated open space in the county's general plan, its zoning allows the construction of one single family home per parcel.

The Attards allege that they are also the owners of the two parcels constituting the 3-acre property at 21 Old Tunnel Road (Old Tunnel Road property).[1] The Old Tunnel Road property is also located near the east portal of the tunnel in an unincorporated portion of the County, although on the opposite side of Highway 24. It has the same zoning as the Fish Ranch Road property and is similarly distant from urban development.

**A.  Sewage Disposal Through The Tunnel.**

The chief barrier to development of the Attards' properties appears to be devising an acceptable means for sewage treatment. The County requires every structure to be connected either to a sanitary sewer, if a connection is available, or to an "individual system" for sewage disposal. (Contra Costa County Code, § 420-6.301.) Because the properties are located well outside local urban limits, they are not served by any municipal sewage system. Beginning in 2003, the Attards attempted to obtain County approval of two different means for individual sewage disposal on the Fish Ranch Road property, a septic system and a holding tank system, but they were unsuccessful. Difficulties with sewage disposal had also thwarted development on the Old Tunnel Road property.

Apparently having concluded that connection to a sanitary sewer was the only way to develop their two properties, the Attards found an undeniably creative solution. In

---

[1] The actual ownership of the Old Tunnel Road property is unclear. The administrative record reflects only that one Tamara Lewis, presumably the former name of Tamara Attard, is one of several owners of one of the parcels under 1984 grant deed. Because the County has not objected to the Attards' standing to pursue this action with respect to the Old Tunnel Road property, the issue of ownership is immaterial.

January 2005, an Attard family company, the Bayseng Spice Company (Bayseng), entered into a contract (the tunnel agreement) with the state Department of Transportation (CalTrans).[2] Under the tunnel agreement, Bayseng agreed to reconstruct the tunnel's sewage disposal system in return for the right to connect the Fish Ranch Road and Old Tunnel Road properties to the rebuilt system. At the time, the east portal of the tunnel had a single restroom, served by a septic system. Bayseng committed to build a sewer lateral across the Old Tunnel Road property, connect that lateral to the east portal restroom facilities, and run a sewage line from those facilities through the tunnel, by way of an existing air duct. After emerging on the tunnel's west side, this line would connect to an existing restroom there, which was provided sewage service by the City of Oakland (Oakland). Bayseng also agreed to upgrade the existing sewer line running from the west portal restroom to Oakland's facilities. It was intended that the Fish Ranch Road property would tie into the lateral to be built on the Old Tunnel Road property, thereby providing both properties with sewage treatment and disposal by the Oakland sewer system. Bayseng agreed not only to pay all construction costs, but also to pay for upkeep of the new system.

Under the tunnel agreement, Bayseng was responsible for obtaining the permits necessary to carry out the plan from the County, Oakland, and Alameda County, as well as encroachment permits from the state. At some point in 2007, work under the tunnel agreement had been completed, and a sewer line connected the Fish Ranch Road and Old Tunnel Road properties to Oakland's sewer system. The total cost of the improvements to the Attards was estimated at $800,000.

The Attards were less diligent in securing the proper permits. While an encroachment permit was eventually issued by CalTrans, allowing Bayseng to build a sewer line through the tunnel and connect it to a sewer pipe on the Old Tunnel Road property, the permit was issued nunc pro tunc, well after the work had been completed.

---

[2] Bayseng was in the business of collecting and drying bay leaves and maintained a mailing address at the Old Tunnel Road property. The nature of Bayseng's operations at the property, if any, is unclear from the record.

3

The Attards never obtained a permit from Oakland allowing them to use the Oakland sewer system, nor did the county issue a permit authorizing construction of sewer lines on the Old Tunnel Road property. Perhaps most important, neither the Attards nor Oakland obtained the consent of the county Local Agency Formation Commission (LAFCo) to Oakland's provision of sewage treatment service to parcels located outside its jurisdictional boundary, as required by state law. (Gov. Code, § 56133, subds. (a), (f).) Nonetheless, as discussed below, the Attards obtained permits for development on both of the properties from the County in reliance on the facilities constructed pursuant to the tunnel agreement.

### B. The Fish Ranch Road Permit.

In October 2005, the Attards applied to the County for a permit authorizing the construction of the foundation for a 4400-square foot residence on the Fish Ranch Road property. At the time, the County maintained a "One Stop" permit policy. The purpose of the policy was to insure that all the necessary agencies within the County reviewed those aspects of a permit application for which the agencies were responsible before any permit issued. As a practical matter, this required the application materials, in the words of a former planner, "to be routed, reviewed by, and discussed amongst Planning, Building Inspection, the Fire District, the Sanitary District, and Environmental Health, as appropriate," depending upon the issues raised by the application. Although in theory approval by the County Environmental Health Division (EHD) was required for a proposed sewer hook-up, in practice projects that proposed a sewer connection were not typically reviewed by EHD, presumably because a sewer connection to an existing sewer system is ordinarily a straightforward matter. Consistent with this practice, the County did not require written EHD approval when a project involved a sewer connection.

In examining the 2005 application, a County planner told the Attards that a foundation-only permit was unavailable and required them to submit complete residential plans. At a subsequent meeting, the Attards told the County that they intended to connect to the CalTrans sewer system and promised to submit plans demonstrating both the method of connection and appropriate agency authorization. When the Attards re-

submitted their plans, they bore stamps of approval from CalTrans and the Oakland Public Works Department. A County planner accepted the two approval stamps as indicating regulatory approval for the sewer connections. Only later did the County learn that the Oakland stamp meant only that "the proposed upgrade of the existing sanitary sewer pipe to 8 [inches] is adequate from engineering standards" and did not constitute approval for a new sewer connection. Further, although the County Director of Building Inspections instructed his staff to obtain the approval of the proposed sewer connection by EHD prior to issuance of a permit, County staff eventually approved the plans without EHD's sign-off. Notwithstanding staff's original refusal to issue a permit only for construction of a foundation, the County issued a permit that specified it was for "Foundation Only" improvements. By November 2007, the Attards had completed the installation of 54 foundation piers under this permit.

In 2008, the Attards applied for a new permit, authorizing an even bigger residence. In April, the new permit, this time for the entirety of an 8400-square foot residence, was approved, and the earlier foundation-only permit was cancelled. Before the present dispute erupted, the Attards had installed an additional 48 foundation piers under this permit. The total cost of the pier installation on the Fish Ranch Road property was estimated as $550,000. [3]

In October 2008, the East Bay Municipal Utility District (EBMUD) sent a letter informing the County that the Attards had requested water service to the two properties, triggering a re-examination of the Fish Ranch Road property permit by the County. The review concluded that the permit had been issued in error, given the failure of any responsible County agency to approve either the water supply or a means of sewage disposal for the property. In December 2008, the County ordered the Attards to suspend construction work at the Fish Ranch Road property.

---

[3] The Attards also claimed before the Board to have spent $900,000 constructing a potting shed on the Fish Ranch Road property. Because the potting shed does not appear to require sewage disposal service, it is unclear whether its use is affected by the County's permit revocation.

5

As explained in the stop work notice, the County's conclusion was based on the Attards' violation of County ordinances requiring a person proposing to develop property to submit his or her plans to EHD for approval of the water supply and sewage disposal system of the proposed structure.[4] The building permit issued for the Attards' proposed residence was adjudged invalid because their plans had not been submitted to EHD for approval of either the water supply or sewage disposal system. Further, the County was concerned by the Attards' proposed sewage disposal system, since the CalTrans encroachment permit merely allowed the Attards' to build the infrastructure for a sewer system and did not constitute state permission to discharge wastewater into resulting lines or permission from Oakland to use its sewer system. Nor had Oakland been granted permission from the County LAFCo to treat sewage generated outside its boundaries. (Gov. Code, § 56133, subds. (a), (f).)

The Attards appealed the staff decision to the Board. In a letter submitted by their counsel, the Attards contended (1) it was County policy not to require health officer approval when a building proposes to tie into an existing sewer system; (2) the CalTrans sewer system was not subject to regulation by other agencies; (3) the water supply had been properly approved; and (4) the Attards had gained a vested right to construct the building covered by their approved building permit. Declarations submitted to the Board described the Attards' financial commitments undertaken in reliance on their permit, their efforts to comply with County ordinances and inspections performed on their construction work, their frustrations with County processes, the County's practice of not requiring EHD approval when a building connects to a sewer system, the extensive review conducted by CalTrans of the sewer infrastructure installed by the Attards, and its

---

[4] See County ordinance §§ 420-6.303, subd. (a) [prohibits construction of any building requiring sewage disposal without permit for an approved system]; 414-4.202 & 420-6.305 [require any application for a building permit to be submitted for review and approval of the water supply and sewage disposal system]; 414-4.201 [requires property needing water supply to obtain written approval from the health officer]. The County's motion for judicial notice of these and other ordinances is granted.

6

effective operation. Following a hearing in March 2010, the three members of the Board in attendance unanimously affirmed the staff's action.

### C. The Old Tunnel Road Permit.

The Old Tunnel Road property owners had a long history of inconclusive code enforcement disputes with the County. In 2006, a set of plans for a building at the property was submitted to the County. The plans did not show any plumbing, but in approving the plans EHD included a notation requiring any plumbing to be connected to a sanitary sewer. The Attards thereafter disclosed their plans to connect to the tunnel sewer system. In a March 2007 letter, EHD stated that it was unable to continue processing the project until it had received a copy of the CalTrans encroachment permit, a copy of the tunnel agreement, and a copy of the plans showing the approval of the "applicable sanitary district." A subsequent set of plans was submitted bearing a stamp from the Oakland public works department stating, "approved sewer connection only." EHD approved the plans, again with a notation requiring connection to a sanitary sewer.

The final plans submitted to the County Building Department in February 2008 included plumbing, but they were never submitted to EHD for further approval. Instead, the Attards' architect submitted a copy of the plans approved by EHD in 2006 without plumbing as evidence of EHD's purported approval. A building permit was issued on the basis of these plans in April 2008 for a commercial structure of 420 square feet, having "NO PLUMBING OR HEATING//NO OFFICE SPACE." The record does not explain why a set of plans with a prominent bathroom was approved with an express ban on plumbing.

In January 2009, only days after the County sent the stop work notice in connection with the Fish Ranch Road project, the County sent a letter requiring re-submission of the plans for the Old Tunnel Road project, on the ground that "the description of work on the permit and the work shown on the plans are inconsistent." At this point, the Attards had yet to begin construction work on the project. They appealed this determination to the Board, contending that the claim of inconsistency "was and is

7

factually inaccurate and violates our rights to a fully vested and properly issued permit(s)." This appeal was also denied.

### D. The Present Action.

The Attards filed this action in June 2010, challenging the denial by the Board of their two appeals. The complaint contained causes of action for mandamus, declaratory relief, inverse condemnation, and deprivation of civil rights. By stipulation, the mandamus cause of action was submitted for decision first.

In an October 2012 order, the trial court denied the writ petition. The court reasoned that the Fish Ranch Road permit was "invalid upon issuance" because the Attards had failed to obtain written approval for their water supply and sewage disposal plans and concluded the Attards had no vested right to pursue their plans because of this invalidity. In reaching its conclusion, the court found that the Attards had "actively avoided scrutiny" by EHD, were aware that they were connecting to the tunnel's sewer lateral, rather than "an approved sanitary sewer system," and never revealed to Oakland officials that they would be depositing sewage into its disposal system when they obtained the Oakland approval stamp. The Attards avoided EHD review, the court concluded, in order to avoid scrutiny of their conduct with respect to the CalTrans sewage connection.[5] As to the Old Tunnel Road permit, the trial court held that the Attards had no vested right because they had not yet undertaken work on the project. It noted that even if a vested right existed, it was limited to a building without plumbing, consistent with the issued permit.

The trial court also rejected the Attards' sovereign immunity and due process arguments. As to the former, the court concluded, "it is inconceivable that CalTrans' government function would include granting private sewer hook ups to its sewer lateral to enable collection of sewage from private properties to another jurisdiction's sanitary sewer system." On the issue of due process, which was premised on the alleged bias of

---

[5] The evidence regarding the Attards' cooperation in disclosing the nature of their sewage connection to the County was in dispute. We do not rely on any purported bad faith by the Attards in reaching our conclusions and make no findings on the matter.

one member of the Board, the court found no substantial evidence of actual bias. While the board member had expressed opposition to the Attards' sewer connection, the court held, "a public official can express her opinions on subjects of community concern without tainting her vote on such matters when they come before her."

In a subsequent stipulation, the Attards agreed that their remaining causes of action "are barred and without merit as a matter of law" and consented to entry of judgment against them.

## II  DISCUSSION

The Attards contend (1) they have vested rights to pursue development under the permits or, alternatively, the County is estopped from prohibiting development under the permits, (2) the doctrine of sovereign immunity exempts the method of sewage disposal on their properties from County regulation, and (3) they were denied due process due to bias in the consideration of their appeal of the permits.[6]

### A.  Vested Right.

The doctrine of vested rights is ordinarily applied when a local agency attempts to prevent the completion or use of a project on the grounds that the project, while lawful at the time a permit was issued, had been rendered unlawful by an intervening change in the law.  In the classic case *Avco Community Developers, Inc. v. South Coast Regional Commission* (1976) 17 Cal.3d 785 (*Avco*), the plaintiff developer obtained a grading permit for a coastal residential development prior to the effective date of the Coastal Zone Conservation Act of 1972, Pub. Resources Code, §§ 27000 et seq., which imposed the requirement of a permit from the Coastal Commission for developments within the coastal zone.  Also prior to the effective date, the plaintiff had performed necessary

---

[6] In their opening brief, the Attards did not argue that the Board abused its discretion in finding the permits to have been issued improvidently.  Rather, they contend that they were entitled to pursue the permitted projects notwithstanding any concerns about the propriety of the permits' issuance.  Although the Attards' argue in their reply brief that the decision to suspend the permits was not supported by the evidence, this argument was waived when it was not raised in their opening brief.  (*People v. Rangel* (2016) 62 Cal.4th 1192, 1218.)

9

grading and begun the installation of road and sewer improvements for the development, but because the completion of these amenities was required prior to the issuance of a building permit, the plaintiff had not obtained any building permits for the site. (*Id.* at p. 789.) The issue for the Supreme Court was whether the plaintiff had gained a vested right to complete its development without a coastal zone permit by virtue of the issuance of the grading permit and the completion of substantial work under that permit prior to the change in law requiring a coastal zone permit. As the court explained the doctrine of vested rights, "[i]t has long been the rule in this state and in other jurisdictions that if a property owner has performed substantial work and incurred substantial liabilities in good faith reliance upon a permit issued by the government, he acquires a vested right to complete construction in accordance with the terms of the permit. [Citations.] Once a landowner has secured a vested right the government may not, by virtue of a change in the zoning laws, prohibit construction authorized by the permit upon which he relied."[7] (*Id.* at p. 791.) The *Avco* court found no vested right under the circumstances, reasoning that a grading permit was insufficient to create a vested right if a building permit had not yet issued. (*Id.* at pp. 792-795.)

Directly pertinent to this matter, the *Avco* court held that "neither the existence of a particular zoning nor work undertaken pursuant to governmental approvals preparatory to construction of buildings can form the basis of a vested right to build a structure *which does not comply with the laws applicable at the time a building permit is issued.*" (*Id.* at p. 793 [emphasis added].) Following *Avco*, it is generally recognized that while the issuance of a permit may insulate a party against subsequent changes in the law, it cannot created a vested right to construct or use property in violation of laws in effect at the time of issuance of the permit. (E.g., *City of Monterey v. Carrnshimba* (2013) 215

---

[7] This continues to be an accurate statement of the law. (See *Communities for a Better Environment v. South Coast Air Quality Management District* (2010) 48 Cal.4th 310, 323 ["a property owner who, in good faith reliance on a government permit, has performed substantial work and incurred substantial liabilities has a vested right to complete construction under the permit and to use the premises as the permit allows"]; *Stewart Enterprises, Inc. v. City of Oakland* (2016) 248 Cal.App.4th 410, 418.)

Cal.App.4th 1068, 1097; *Davidson v. County of San Diego* (1996) 49 Cal.App.4th 639, 646.) We review a claim of vested right de novo. (*Stewart Enterprises, Inc. v. City of Oakland* (2016) 248 Cal.App.4th 410, 418.)

There is little doubt that the project approved in the Fish Ranch Road permit was unlawful, as was the project envisioned in the final plans for the Old Tunnel Road project. Both projects anticipated disposing of sewage by way of the Oakland sewer system. The Oakland Municipal Code requires any person performing any work "for the purpose of discharging sewage into the city's sewer system" to obtain a permit for such activity from the city. (Oakland Mun. Code, § 13.08.040.) Not only had the Attards not obtained the required permit, Oakland confirmed in a letter to the County that they had not even applied for a permit. The Oakland stamp on their construction plans, which the Attards apparently represented to the County, implicitly if not explicitly, as granting approval of a sewer connection, merely indicated, according to Oakland, "that the proposed upgrade of the existing sanitary sewer pipe to 8" is adequate from engineering standards."

Yet even if the Attards had obtained consent from Oakland to use its sewer system, the provision of sewer services by Oakland would have been unlawful without further governmental action. As noted above, Government Code section 56133 prohibits an agency from providing such services "outside its jurisdictional boundary" without permission from the LAFCo of the county in which the extension of service is proposed (*Id*., subds. (a), (f); see *Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1283.) Under Government Code section 56375, a LAFCo has the power "[t]o authorize a city or district to provide new or extended services outside its jurisdictional boundaries pursuant to Section 56133." (*Id.*, subd. (p).) The approval can be made at the request of either the service provider or the prospective service recipient. (*Community Water Coalition v. Santa Cruz County LAFCo* (2011) 200 Cal.App.4th 1317, 1327.) The same Oakland letter confirmed that no such LAFCo approval had been sought or obtained. In the absence of these necessary approvals, the project devised by the Attards and implemented in their plans was unlawful. The County's issuance of

11

permits ostensibly approving the Attards' plans therefore did not grant the Attards a vested right to pursue them.[8]

In resolving the issue of vested rights against the Attards, we do not rely on the failure of EHD to grant final approval of the means of sewage discharge or water discharge. As the Attards contend with some force, the County controlled the approval process and under the "one stop" process, it was the County's responsibility to insure that all of the necessary approvals from different departments within the County were obtained prior to granting final approval of the permit. We need not address this issue, however, because, as discussed above, the project approved by these permits is unlawful because it depends upon a means of sewage disposal that is affirmatively prohibited by state law in the absence of LAFCo approval, which was never obtained.

As to the Old Tunnel Road project, as the trial court noted, the Attards had not undertaken any work in reliance on the permit prior to its revocation. They therefore fail to satisfy one of the fundamental requirements of the vested rights doctrine, substantial expenditures in reliance on the permit. (*Avco*, at p. 791.) The Attards point to their expenditures on the tunnel agreement work, but that work cannot have been undertaken in reliance on the permit because it was occurred well prior to its issuance. Further, because the permit does not allow the use of plumbing, any work in connection with the tunnel agreement was irrelevant to the Old Tunnel Road permit. For this reason, the Attards fail to satisfy the preconditions for the creation of a vested right with respect to this permit, regardless of its illegality.

_____

[8] The Attards' sole argument against the application of section 56133 is that they were exempt from LAFCo approval under the doctrine of sovereign immunity. We address this argument below.

12

## B. Equitable Estoppel.

To avoid the problem of illegality, the Attards invoke the doctrine of equitable estoppel in connection with the Fish Ranch Road project.[9] Unlike the vested rights doctrine, estoppel can sometimes be used to force a local agency to allow compliance with an otherwise unlawful permit. (E.g., *Anderson v. City of La Mesa* (1981) 118 Cal.App.3d 657, 661 (*Anderson*) [allowing home constructed in violation of residential setback ordinance].) The doctrine was explained in *City of Goleta v. Superior Court* (2006) 40 Cal.4th 270: " 'The doctrine of equitable estoppel is founded on concepts of equity and fair dealing. It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment. The elements of the doctrine are that (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. [Citations.] [¶] Equitable estoppel 'will not apply against a governmental body except in unusual instances when necessary to avoid grave injustice and when the result will not defeat a strong public policy.' " (*Id.* at p. 279; see also *HPT IHG-2 Properties Trust v. City of Anaheim* (2015) 243 Cal.App.4th 188, 201.)

Equitable estoppel against the government, in other words, is the exception, not the rule. "An additional requirement applies in cases involving equitable estoppel against the government. In such a case, the court must weigh the policy concerns to determine whether the avoidance of injustice in the particular case justifies any adverse impact on public policy or the public interest. [Citations.] . . . Particularly in land use cases, '[c]ourts have severely limited the application of estoppel . . . by expressly balancing the injustice done to the private person with the public policy that would be supervened by

---

[9] Because, as discussed in connection with the doctrine of vested rights, the Attards made no investment in reliance on the Old Tunnel Road permit, they fail to satisfy estoppel's requirement of detrimental reliance for this permit.

13

invoking estoppel to grant development rights outside of the normal planning and review process. [Citation.] The overriding concern "is that public policy may be adversely affected by the creation of precedent where estoppel can too easily replace the legally established substantive and procedural requirements for obtaining permits." [Citation.] Accordingly, estoppel can be invoked in the land use context in only "the most extraordinary case where the injustice is great and the precedent set by the estoppel is narrow." [Citation.]' " (*Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1262-1263 (*Schafer*); see similarly, *Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 321 (*Toigo*).) We review a trial court's application of the doctrine of equitable estoppel for substantial evidence. (*Feduniak v. California Coastal Commission* (2007) 148 Cal.App.4th 1346, 1360.)

We conclude that the Attards have failed to demonstrate that this is the type of "extraordinary case" (*Smith v. County of Santa Barbara* (1992) 7 Cal.App.4th 770, 775 (*Smith*)) in which "the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 497.) As noted above, estoppel is justified only when " ' "the injustice is great and the precedent set by the estoppel is narrow." ' " (*Schafer*, at p. 1263.) There is nothing unique or unusual about these circumstances that would permit the creation of a narrow precedent. Issuance of the permits appears to have resulted from carelessness by a likely overburdened planning agency, tasked with coordinating responses from several other County departments. This is an ordinary, if hopefully not common, circumstance. As in *Smith*, "there is little to distinguish this case from any other case where a party claims reliance on a governmental permit." (*Id.* at p. 775.) Nor do we find "the injustice [to be] great." The Attards have invested some $550,000 installing foundation piers on their property, and it will undoubtedly be a hardship for them if those piers are rendered

14

useless.[10]  Any injustice, however, is mitigated by the Attards' failure to obtain the necessary approvals from Oakland and LAFCo and to disclose to the County the unpermitted nature of their proposal, prior to issuance of the permit.  They are, to this degree, complicit in the wrongful issuance of the permits.

Second, any hardship fails to override "the public policy that would be supervened by invoking estoppel to grant development rights outside of the normal planning and review process."  (*Toigo*, at p. 321.)  The Attards' violation is no way comparable to the de minimis and harmless encroachment into a residential setback found in *Anderson*.  Application of the doctrine of estoppel in these circumstances would approve an active and continuing violation of law through the daily unapproved discharge of County sewage into the Oakland sewer system.  The requirement of governmental approval for such a discharge by both Oakland and LAFCo is presumably required to insure that public health and safety policies are protected.  Invocation of the doctrine of equitable estoppel would permit the Attards to evade this necessary scrutiny.

### C.  Sovereign Immunity.

The Attards contend the County was precluded from denying their permits because their association with CalTrans insulated them from local regulation of their sewage disposal plans under the doctrine of sovereign immunity.

In general, "[w]hen [the state] engages in such sovereign activities as the construction and maintenance of its buildings, as differentiated from enacting laws for the conduct of the public at large, it is not subject to local regulations unless the Constitution says it is or the Legislature has consented to such regulation."  (*Hall v. City of Taft* (1956) 47 Cal.2d 177, 183.)  The doctrine only applies to a state agency's exercise of "uniquely governmental functions."  (*Regents of the University of California v. Superior Court* (1976) 17 Cal.3d 533, 537.)  When an agency acts "in a capacity no different from a private university, corporation, or individual," sovereign immunity does not attach.  (*Ibid.*)  Further, a private party's activities are entitled to the protection of sovereign

---

[10] The Attards also spent $800,000 to upgrade the tunnel sewer system, but that expenditure was made prior to issuance of the permit, not in reliance on it.

15

immunity only if those activities are "within [the] governmental functions" of a state agency. (*Bame v. City of Del Mar* (2001) 86 Cal.App.4th 1346, 1357.)

The Attards' claim of sovereign immunity fails because their discharge of sewage into the Oakland sewage treatment system is unrelated to any governmental function of CalTrans. There is little doubt that, in the absence of legislative consent, CalTrans is immune from local regulation in its construction and operation of the tunnel. The Attards' planned developments, however, are unconnected to these activities. Further, the specific activity the Attards claim to be free of local regulation, the treatment and disposal of their sewage, is unconnected to any CalTrans activity, sovereign or otherwise. Their sewage merely flows through a sewer line that also accommodates CalTrans sewage. The only reason the Attards are in a position to argue for sovereign immunity is that CalTrans consented to this flow as a quid pro quo for the Attards' re-construction of the tunnel sewage system. Perhaps that association would create immunity for the Attards' construction activities and the treatment of sewage generated by CalTrans, although the latter point is debatable.[11] (See *Del Norte Disposal, Inc. v. Department of Corrections* (1994) 26 Cal.App.4th 1009, 1013-1014 [prison facility immune from local regulations governing solid waste disposal].) But we are unpersuaded that the doctrine reaches so far as to insulate from local regulation the disposal of sewage generated by a private party, merely because CalTrans consented to share its sewer line to obtain a free facilities upgrade.

Controlling here is *Board of Trustees v. City of Los Angeles* (1975) 49 Cal.App.3d 45, in which the court held that a private party's operation of a circus is not insulated from local regulation merely because the circus will be conducted on property leased from a state university. (*Id.* at pp. 49-50.) As the court held, "the previously well

---

[11] While the case law clearly holds that a local agency cannot compel a state facility to *accept* solid waste disposal services from a particular provider, that is a different matter from the circumstances presented here: allowing the state agency to *compel* a local sewage disposal agency to accept and process sewage. State agencies have a sovereign right to be free of certain restrictions on their activities by local agencies. They do not necessarily have the right to involuntarily enlist local facilities for their own purposes.

recognized distinction between governmental and proprietary activity [citations] serves to limit that immunity to the situation where the state is operating in a governmental capacity. . . . In the case at bar the board leases the [property] as a revenue-producing activity. The activities which are conducted thereon by private operators have no relation to the governmental function of the university. '[The] state is acting in a proprietary capacity when it enters into activities . . . to amuse and entertain the public. The activities of [the board] do not differ from those of private enterprise in the entertainment industry.' " (*Id.* at p. 50.) CalTrans allowed the Attards to share its sewer line in order to receive free construction services. The Attards' use of the line is therefore in the nature of a lease, with the Attards paying for the lease in kind through the provision of construction services, rather than through periodic payments. Because CalTrans' leasing of its sewer line to a private party does not serve its governmental function of managing public transportation systems, the Attards' sewage treatment and disposal is not protected from local regulation by the doctrine of sovereign immunity.

### D. Board Bias.

The Attards contend they were denied a fair hearing of their appeal as a result of the bias of one member of the Board, Gayle Uilkema.

The Attards' opening brief contains a description of activities purportedly undertaken by Uilkema to obstruct their development and revoke their permits. The description is unsupported by references to evidence in the administrative record, with the exception of a single e-mail sent by Uilkema to CalTrans a few months prior to the hearing of the Attards' appeal.[12] In that e-mail, Uilkema states that "an illegal connection has been made to a CalTrans sewer in the Caldecott Tunnel without the necessary land use permits," claims the Attards "have been bypassing the legal authority of Contra Costa County for many years," and asks for CalTrans's help in gaining discontinuance of the

---

[12] In fact, the Attards' brief on appeal lacks any citation to evidence of Uilkema's alleged activities. The citation to the e-mail is contained in the Attards' memorandum of law filed in the trial court. Although we are not required to consider such evidence (*Parker v. Wolters Kluwer United States, Inc.* (2007) 149 Cal.App.4th 285, 290), we exercise our discretion to do so.

17

line's use "until the project has been submitted to all proper authorities for review and declared legal."

The due process standards applicable to a public body in these circumstances were established in *Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470 (*Nasha*). In that case, a planning commission reversed the planning staff's approval of a mitigated negative declaration for a locally controversial development. (*Id.* at pp. 477-478[.]) After the vote, it was learned that a particular planning commission member had published an anonymous article hostile to the project in a local newsletter and introduced a person at a meeting of local residents who spoke against the project. (*Id.* at p. 476.) The *Nasha* court found the commission's action to have been "quasi-judicial" and concluded that, for that reason, "[p]rocedural due process principles" are applicable. (*Id.* at p. 482.) Among those principles, the court held, is the requirement of a "reasonably impartial, noninvolved" reviewer. While this standard does not demand the same degree of impartiality required of a judicial officer, the court held, it precludes participation by a person who has demonstrated actual bias. (*Id.* at p. 483.) In order to prevail on a claim of bias, the plaintiff "must establish ' "an unacceptable probability of actual bias on the part of those who have actual decisionmaking power over their claims." ' " (*Ibid.*)

While we acknowledge the possibility that Uilkema's e-mail might demonstrate the type of bias proscribed by *Nasha*, we conclude that the Attards forfeited this claim when they failed to raise the issue of bias at the Board hearing and seek Uilkema's recusal.

When a litigant suspects bias on the part of a member of an administrative hearing body, the issue must be raised in the first instance at the hearing. (*Franz v. Board of Medical Quality Assurance* (1982), 31 Cal.3d 124, 143.) Most recently, in *Basurto v. Imperial Irrigation Dist.* (2012) 211 Cal.App.4th 866, a public agency employee challenged the termination of his employment on grounds it resulted from unlawful discrimination. In connection with that challenge, he also contended the agency board that reviewed his termination was biased and failed to provide him due process of law. (*Id.* at pp. 870-871.) The trial court found these issues waived because they were not

18

raised at the administrative hearing, and the Court of Appeal affirmed. (*Ibid.*) Although the plaintiff's and the agency's attorneys had exchanged letters regarding the issue of bias, this was held insufficient because the letters were not brought to the board's attention at the hearing. As the court held, "due process and bias issues must be presented to the hearing officer or tribunal itself for the issue to be preserved." (*Id.* at p. 892, fn. 6.) The court deemed the plaintiff's attorney's "passing reference in his opening statement" to these concerns to be insufficient, noting, " '[t]he mere allegation of bias in [an administrative hearing] without any evidence to support [it]' is not enough." (*Ibid.*; see similarly, *Southern Cal. Underground Contractors, Inc. v. City of San Diego* (2003) 108 Cal.App.4th 533, 549 ["An issue not raised at an administrative hearing, including a claim of bias, may not be raised in later judicial proceedings"].) There is no dispute that the Attards did not raise the issue of Uilkema's possible bias at the March 2010 Board hearing.

If the Attards did not learn of the facts underlying their claim of bias until after the hearing, they might have been justified in waiting until the trial court proceedings to raise the issue. (See *Niles Freeman Equipment v. Joseph* (2008) 161 Cal.App.4th 765, 788-789.) That does not appear to have been the case. The staff's decisions to revoke the Attards' permits occurred in late 2008 and early 2009. The Board did not hear the Attards' appeal of those decisions until March 2010. In the interim, in December 2009, the Attards filed a request to view the county files maintained in connection with both of their properties. This was later formalized as a request under the Public Records Act (Gov. Code, § 6250 et seq.), seeking "internal files and emails" relating to the properties. The County acknowledge the request and made the relevant records available on January 8, 2010, approximately two months prior to the Board hearing. While the contents of the County's response is not recorded in the record, we presume that Uilkema's e-mail, which was sent several months earlier, was included among the documents made available. In any event, the e-mail was responsive to their request, and the Attards do not contest the County's claim that it was made available. Further, certain other facts underlying the claim of bias, such as Uilkema's service on the local LAFCo, were matters

19

of public knowledge.  Accordingly, the Attards' failure to raise this issue before the Board waived the claim of bias.

## III  DISPOSITION

The judgment of the trial court is affirmed.

_____

REARDON, ACTING P. J.

We concur:

_____

RIVERA, J.


   As to Section II. D (Board Bias) I concur in the result only.


_____

STREETER, J.

*Attard v. Board of Supervisors* A138702

21

Trial Court:                      Contra Costa County Superior Court

Trial Judge:                     Honorable Steven K. Austin

Counsel for Appellant:        Law Offices of David J. Bowie
David J. Bowie

Counsel for Respondents:    County Counsel
Sharon L. Anderson
Deputy County Counsel
Linda Wilcox

Gordon, Watrous, Ryan, Langley, Bruno & Paltenghi
Timothy J. Ryan

*Attard v. Board of Supervisors* A138702

22