Filed 7/19/22 Sullivan Equity Partners v. City of Los Angeles CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| SULLIVAN EQUITY PARTNERS, LLC,<br><br>　　　Plaintiff and Appellant,<br><br><br>　　　v.<br><br><br>CITY OF LOS ANGELES<br><br>　　　Defendant and Appellant. | B305063<br><br><br>(Los Angeles County<br>Super. Ct. No. BS169541) |

　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Mary Strobel, Judge.  Reversed in part; affirmed in part.

　　　Jeffer, Mangels, Butler & Mitchell, Benjamin M. Reznik, Matthew D. Hinks and Seena Max Samimi for Plaintiff and Appellant Sullivan Equity Partners, LLC.

　　　Michael N. Feuer, City Attorney, Terry P. Kaufmann, Assistant City Attorney, Charles D. Sewell and Patrick Hagan, Deputy City Attorneys for Appellant City of Los Angeles.

Appellant City of Los Angeles (the City) issued a permit allowing respondent, developer Sullivan Equity Partners, LLC (Sullivan), to remove 56 protected trees from two lots as part of the construction of two residences on the lots. It is undisputed that Sullivan also removed three protected trees that it was not permitted to remove; Sullivan contended it did so accidentally, while the property's neighbors claimed otherwise. After the City's Bureau of Street Services (BSS) learned of the removal, it held an administrative hearing and revoked Sullivan's building and grading permits for five years pursuant to a municipal ordinance authorizing such action. Sullivan filed an administrative appeal to the City's Board of Public Works (BPW). Following a second administrative hearing, the five-member BPW voted unanimously to uphold the BSS decision.

Having exhausted administrative review, Sullivan filed a federal lawsuit. After that lawsuit was stayed, Sullivan filed the instant action, a petition for writ of mandate and inverse condemnation. Sullivan alleged that the City violated Sullivan's due process rights by failing to provide an unbiased administrative process. The trial court agreed, finding an unacceptable probability of bias by City officials during the administrative proceedings. The court thus issued a writ pursuant to Code of Civil Procedure section 1094.5[1] directing the City to set aside the administrative decision and sanction revoking Sullivan's permits.

The City appealed, arguing that Sullivan failed to establish any due process violation. We conclude that the trial court erred in finding sufficient evidence of bias to overcome the presumption of impartiality afforded to administrative decisionmakers. We therefore reverse the trial court's order issuing an administrative writ.

Sullivan also filed a cross-appeal challenging the trial court's dismissal of Sullivan's second cause of action regarding the City's revocation of its grading permits. The trial court found that this issue was moot. Because we hold that the City's decision to revoke Sullivan's building permits may stand, Sullivan acknowledges that it can no longer proceed with its original development project, and has not shown an entitlement for the grading

---

[1]    All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

2

permits for that project.  Thus, we affirm the dismissal of Sullivan's second cause of action.

## FACTUAL AND PROCEDURAL HISTORY

### I.    *Protected Tree Ordinance*

The City's Protected Tree Ordinance (Los Angeles Municipal Code (LAMC), § 46.00 et. seq.) requires a property owner seeking to relocate or remove a protected tree to obtain a permit from the BPW.  (*Id*., § 46.02.)  The ordinance includes as "protected trees" four indigenous tree species—oak, Southern California black walnut, western sycamore, and California bay— and protects trees measuring four inches or more in cumulative diameter, four and a half feet above the ground level at the base of the tree.  (*Id*., § 46.01.)

The permit application "shall indicate, in a manner acceptable to the Board of Public Works, by number on a plot plan, the location of each protected tree or shrub, and shall identify each protected tree . . . proposed to be retained, relocated or removed."  (LAMC, § 46.02.)  The BPW may approve removal of a protected tree if, among other things, it determines that "[i]t is necessary to remove the protected tree . . . because its continued existence at the location prevents the reasonable development of the subject property."  (*Id*., § 46.02, subd. (b).)  The BPW may also impose conditions upon the issuance of a tree removal permit, including requiring replacement trees to be planted. (*Id*., § 46.02, subd. (c).)

When a protected tree is removed without the required permit, LAMC section 46.06 authorizes the BSS to request that the Superintendent of Building revoke any building permits issued for that property for which construction has not commenced and to withhold the issuance of building permits for up to ten years.  Prior to invoking this section, the BSS is required to give notice to the property owner and to hold a hearing, at which the owner may submit "any evidence it deems relevant."  (*Id*., § 46.06, subd. (b).)  In making its determination, the BSS "shall consider the following factors:  the number of trees . . . removed or relocated; the size and age of the trees . . . removed or relocated; the knowledge and intent of the owners of the property with respect to the removal or relocation; and prior violations of law

3

with respect to removal or relocation of protected trees." (*Id.*, § 46.06, subd. (c).)

The property owner may appeal the BSS determination to the BPW. (LAMC, § 46.06, subd. (d).)

## II.     *The Properties and Trees at Issue*

Sullivan is a real estate development company that owns the two properties at issue, consisting of about 12 acres of vacant and unimproved land on Old Ranch Road in the Brentwood community of Los Angeles. Sullivan sought to construct two large single-family homes on the properties, with a single, shared driveway.

### A.     *Tree report and permit*

In 2012, Sullivan's arboricultural consultant, Robert Wallace, performed a tree study of the properties. Wallace's protected tree report (PTR) reported that the properties contained 117 protected trees, including 104 California live oaks and two sycamores. The PTR further stated that the planned development required the removal of 56 protected trees, including 51 oaks and one sycamore. The PTR identified each protected tree by number, by location on a tree map, in a labeled photograph, and in a chart that included the tree species, size, and physical condition. The PTR also identified nine of the remaining protected trees that would be impacted by the construction and discussed plans for protecting and monitoring those trees during construction activities. The PTR included lists of the protected trees to be removed and the trees to be preserved, identified by number and species letter (for example, sycamore tree number 5 was listed as "5s").

In December 2012, Sullivan applied to the BSS, Urban Forestry Division, for a permit to remove 56 protected trees from the properties. On February 1, 2013, the BSS submitted a letter to the BPW recommending approval of the requested tree removal permit. The letter, submitted by BSS Director, Nazario Sauceda, stated that the proposed residences would each be 10,000 square feet or larger and their construction would require "massive grading" to the properties. A BSS arborist inspected the site in October 2012 and agreed with the assessment of the PTR that removal of the 56 trees was necessary "to allow reasonable property development" pursuant to LAMC

4

section 46.02.  The letter noted that Sullivan would be required to plant specified replacement trees onsite.

The BPW heard the permit request at a meeting in February 2013. Ron Lorenzen presented the matter on behalf of BSS.  He told the BPW that it was "disturbing" that half of the protected trees would be removed, but that BSS was "very thorough" in looking at the site and consulting with the arborist, and because of the extent of grading necessary, there was "no way" to do the project without impacting that number of trees.  The BPW voted to approve the permit.

**B.** *Tree Removals*

Sullivan hired Ricardo Gonzalez[2] to remove the trees, and provided him with the permit and tree site map.  On September 29, 2014, Gonzalez and his crew cut down 55 of the 56 trees permitted for removal.  It is undisputed that they also cut down the following three protected trees that were not permitted for removal: (1) tree number 5, a California sycamore located near the front of the property, measuring 26 inches in diameter, 80 feet tall, and 50 foot canopy spread; (2) tree number 29, a California live oak, measuring four inches in diameter, 20 feet tall; and (3) tree number 30, a California live oak located in close proximity to tree number 29,with a double trunk measuring 12 and 10 inches in diameter, standing 35 feet tall.  According to the 2012 tree report, all three trees were rated "excellent" in health, aesthetics and conformity, and balance.  Gonzalez left several trees that had been permitted for removal, including tree number 6, a California live oak located near tree number 5 at the front of the property.[3]  Tree number 6

---

[2]     We note that as some points in the record, the contractor's last name is spelled "Gonzales" rather than "Gonzalez."  We adopt the latter spelling, as it is used more frequently throughout the record, and it appears to comport with his own signature on his declaration.

[3]     There is some inconsistency in the record regarding the number of permitted trees removed.  In Sullivan's initial submission to the BSS, arborist Wallace stated that 55 permitted trees were removed, consistent with the BSS's subsequent finding that Sullivan removed 58 trees total, including 55 permitted and three unpermitted.  However, in Sullivan's appeal submission to the BPW, Sullivan asserted that it had removed 55 trees total,

measured 22 inches in diameter, stood 35 feet tall, with a 30-foot spread. The PTR indicated its removal was necessary for the project's main driveway construction.

## III. *Administrative Review*

### A. *Investigation*

Following the tree removals, neighbors complained to Sullivan and to BSS, and requested an investigation into whether Sullivan had complied with its permit. The City took no action until December 2015,[4] when BSS arborists inspected the properties and determined that Sullivan had removed protected tree numbers 5, 29 and 30 without a permit. On December 17, 2015, BSS issued a Notice of Administrative Hearing to Sullivan, setting a hearing regarding the illegal removal of protected trees and BSS's "intent to act" pursuant to LAMC section 46.06. The hearing was continued at Sullivan's request to February 12, 2016.

### B. *Pre-hearing submissions*

Prior to the BSS hearing, Sullivan submitted a letter brief, declarations, and documentary evidence. Sullivan argued that harsh sanctions were not warranted, because it only removed three unpermitted trees, only one of those trees was larger and older (number 5), the evidence showed it did so accidentally, and it had committed no prior violations. Sullivan also offered to implement additional mitigation efforts, including providing one or two replacement trees "of substantial size and age (e.g. 10-20 years)" to replace tree number 5. Sullivan stated that it was "committed to future compliance" by hiring an arborist to be on site during "any future tree removal or similar activities."

Sullivan submitted a declaration from arborist Wallace, who stated that he performed a follow-up site visit on January 8, 2016. Wallace

including three unpermitted, and left four permitted trees standing, relying on the declaration of arborist Applegate. Regardless of the total number, it is undisputed that three unpermitted trees were removed and at least one permitted tree (number 6) was left standing.

[4] In the meantime, development of the properties had been halted due to purported violations of the Clean Water Act and alteration of an adjoining streambed.

confirmed that tree number 6 was permitted to be removed but remained on the property, and was located right next to removed tree number 5. He stated that the two were "similar in trunk size," with tree number 6 measuring 22 inches in diameter and opined that "the removal of trees # 5, #29, and #30 was likely an inadvertent mistake, especially considering the number and location of trees on the subject property, and the number of trees properly cut down (55) compared to the incorrect number (3) of tree[s] cut down." Sam Shakib and Sean Namvar, Sullivan owners, also submitted declarations stating that they did not intend to remove unpermitted trees and were not aware it had occurred until they received the notice of hearing from BSS in December 2015. Both owners also stated that the unpermitted removals did not benefit the project. Nathan Ahdoot, a Sullivan employee, also provided a declaration stating that he had been present on the site when the trees were removed on September 29, 2014. Ahdoot met with Gonzalez that morning at the property, and confirmed that Gonzalez had copies of the tree report and removal permit. Ahdoot also averred that the removals "provide[d] no benefit" to Sullivan.

Several community members submitted letters to BSS, asking the bureau to revoke Sullivan's building permits and withhold further permits for 10 years. In addition, the Sullivan Canyon Property Owners' Association (the neighbor group) submitted documents, including a report from another arborist, Jan Scow. Scow estimated that tree number 5 was 50 to 75 years old, tree number 29 was 15 to 20 years old, and tree number 30 was 50 to 75 years old. He also opined that "there is no reason to believe that the developer complied with any protection measures for the subject trees," noting the instructions from the PTR that required the trees to be protected by fencing and monitored by the arborist.

### C. BSS hearing

Lorenzen, BSS assistant director, served as the hearing officer for the February 12, 2016 hearing. The hearing was also attended by Greg Spots and Tim Tyson of BSS, as well as a deputy city attorney. Also attending were counsel and representatives for Sullivan, neighbors, representatives for several environmental and community organizations, and a representative from Los Angeles City Council member Mike Bonin's office.

7

Lorenzen began the hearing by explaining that its purpose was to "state the facts and to look at all of those facts." He cited the four factors pursuant to LAMC section 46.06 and stated that they "are the only four factors that can be used in any determination by this bureau. This bureau has not made any predetermined -- predetermination of anything we're gonna do in regards to this case, none whatsoever. We're here today to determine, specifically, what has occurred, relative to the issuance of that permit."

Counsel for Sullivan acknowledged the timeline of events provided by BSS and admitted that Sullivan had cut down tree numbers 5, 29, and 30 without a permit. Citing the PTR, he argued that the number of trees was insignificant, constituting about five percent of the number permitted for removal. He also argued that the removals were "inadvertent," but not a "massive mistake," noting, "It's not like we cut down 100 and had a permit for 50." He contended that the evidence showed the removals were accidental, citing Sullivan's procedures in tagging each tree to be removed, as well as the owners' statements that the removals did not benefit Sullivan but would involve additional cost, as Sullivan now "had to pay for work that wasn't accomplishing what [it] wanted done." Additionally, he stated that Sullivan had "invested millions of dollars in this project" and it would be "fundamentally unfair" to revoke its permits based on the accidental removal of three trees. He also echoed Sullivan's prior offer of additional remediation.

Gonzalez, Wallace, and one of the owners testified on Sullivan's behalf, echoing the information provided in their declarations. Arborist Wallace testified that the site was "a difficult site" and he could "totally understand why . . . there could have been a mistake. Because they're just going by tags on the trees." He opined that if "somebody wasn't very familiar with the color coding on the map and so forth, I can see how confusion could happen[ ]." He noted the proximity of tree number 5 to number 6 at the front of the property and stated that he could easily see how the former was cut down instead of the latter. Wallace stated that during his site visit after the trees were cut, he observed that Gonzalez had "carefully and prudently staked each and every tree that was cut, put a red ribbon on it and then actually took the tag off the tree [when cut] and put it on the stake," which "told me that they were diligent about what they were doing. And that there was nothing

8

underhanded or nobody's trying to hide anything. It was - - it was, obviously, a mistake."

Gideon Kracov, counsel for the neighbor group, gave a PowerPoint presentation urging the BSS to revoke Sullivan's permits. He argued that Sullivan had intentionally cut down the three trees, noting that Wallace had not been present at the time. He also pointed to the age and size of the sycamore, which was the tallest tree on the property by far, according to Wallace's PTR. Lorenzen asked Wallace what he thought about the age of the trees. Wallace opined that the sycamore (tree number 5) was "easily" 75 to 80 years old, tree number 29 was five to six years old and tree number 30 was about 10 years old.

Some neighbors and community members also spoke at the hearing, including the chairman of the Brentwood community council. He reported that the council had adopted a resolution urging the BSS to enact the recommended sanctions, because once "a 75-year-old tree is down, it's down forever" and a strong sanction would discourage future violations. He noted that the sycamore was "right in the front, center," of the property and argued its removal "was not done out of ignorance." Another community member noted the significant loss of the sycamore to the ecology of the area. A representative from council member Bonin's office argued that the project had caused "unalterable damage," and reported that Bonin was "absolutely livid" when he learned of the tree removals. She noted that the trees removed were identified in Sullivan's own tree report as ones that would be protected. She also argued that, "as far as I understand it," the removal of tree number 5 "would help make the project easier to accomplish," and urged the BSS on behalf of Bonin to revoke Sullivan's permits for the maximum time allowable.

In rebuttal, counsel for Sullivan argued that it would be "draconian" to revoke the permits given the amount of money invested and the small number of unpermitted trees removed. Wallace also rebutted the neighbors' claim that protective measures such as fencing were required during tree removal, noting that those measures were meant to be put in place afterward, in order to protect the remaining trees during construction.

9

## D. *BSS determination*

The BSS issued its written determination on March 14, 2016, in a letter signed by BSS Director Sauceda. BSS detailed the facts regarding the issuance of the tree removal permit in 2013, the tree removal in 2014, and its inspection in December 2015 that confirmed the unpermitted removal of tree numbers 5, 29, and 30. BSS stated that it then held the February 2016 administrative hearing "to hear testimony relative to" the unpermitted tree removals. At the hearing, "it was determined and agreed to by [Sullivan] that the three unpermitted protected trees had in fact been removed." The BSS stated that it "reviewed all facts relative to the case as presented at the February 12, 2016 administrative hearing," in order to consider the requisite factors provided by LAMC section 46.06.

Citing the PTR and Wallace's testimony at the hearing, the BSS found that tree number 5 was at least 70 years old, tree number 29 was approximately 10 years old, and tree number 30 was approximately 30 years old, and all three trees were in excellent condition. Further, the decision found that "[i]f not the most significant of the property's trees, tree number 5 was certainly one of the largest. Also, tree number 5 was situated very prominently at the front of the project and in fact provided a landmark upon arrival at the property." The decision noted that the evidence from Sullivan, including testimony by its owners, Wallace, and Gonzalez, showed "that the PTR did accurately reflect the trees the project proposed for removal. [Sullivan] and their team described their rigorous plan to ensure the correct trees were removed. . . . Further, [Sullivan] and their team indicated all onsite tree removal personnel were made aware of the process."

The BSS then made the following findings: First, regarding the number of tree removals, the BSS found that the "removal of one California Sycamore on the subject properties is significant both to the California Sycamore population and the woodland in total." The removal of the two California live oak trees was "less than significant" relative to the oak tree population on the properties, but was "significant relative to the holistic woodland on the properties."

Second, regarding tree age and size, the BSS found that tree number 5 (the sycamore) was "in excellent condition, large in size, and at least seventy

years of age and potentially much older." As such, it "would have been expected to live much longer" and "its loss is very significant to the subject property. In addition, given the location of the tree at the front" of the property, "its removal is especially relevant to the adjoining public right of way." The loss of tree number 29, a young and small tree, was "less significant." The loss of tree number 30, a "young adult tree, approximately thirty years of age and with a significant spread," was "significant to the subject property," as it "would have been expected to live much longer" due to its "health, age and condition."

Third, the BSS found that it was "clear from the evidence" that Sullivan had knowledge that the three trees were not proposed for removal and that Sullivan admitted the "project had implemented a comprehensive process to ensure that only those trees permitted to be removed would in reality be removed." The BSS incorrectly noted that "no California Sycamore trees were included in the PTR for removal."[5] The BSS also found that the sycamore "species is distinct in appearance, growth habits, and foliage relative to the tree adjacent to it, tree number 6," an oak. The BSS concluded that the three unpermitted trees "were not removed by accident but intentionally to provide better access to the property or in some other fashion enable easier development." As for the fourth factor, BSS noted earlier in the decision that there was no evidence that Sullivan had previously been found in violation of section 46.00.

Accordingly, pursuant to LAMC section 46.06, the BSS determined that it would "request in writing that the Department of Building and Safety revoke any existing building permits and withhold the issuance of future building permits on both properties for a period of five (5) years." The

[5] In its appeal to the BPW, Sullivan stated that the properties contained two sycamores, tree number 5, which was not permitted for removal, and tree number 46, a smaller tree, which was permitted to be removed. In fact, it appears the properties had *three* protected sycamores, which Sullivan noted to the trial court during the hearing on the writ. Tree numbers 20 and 46, both smaller sycamores, were permitted for removal, while tree number 5 was not. The 2012 PTR is inconsistent on this point, stating multiple times that there were two sycamores, one of which required removal, but identifying tree numbers 5, 20, and 46 as sycamores in its tree list.

11

decision also informed Sullivan of its right to appeal and directed it to contact Sauceda or Lorenzen with any questions.

### E.    *Appeal to BPW*

#### 1.    *Pre-hearing submissions*

Sullivan appealed the BSS decision to the BPW on April 12, 2016. It asserted that the BSS decision was "not fair or based upon the facts, and is instead, punitive." Specifically, Sullivan argued that the removal of the three trees was insignificant and accidental, that revoking its permits would not mitigate the tree loss, and that the punishment was "driven by the loud demands of neighboring property owners."

Citing documents received from the City in response to a Public Records Act request,[6] Sullivan argued that there had been "extensive communications between the [Urban Forestry Division of the BSS], various City officials, and the Project opponents." Sullivan argued that discussions by Lorenzen and James with neighbors and their counsel regarding the property "provided the project opponents months of pre-hearing information relevant to the February 12, 2016 hearing, while withholding that same information from [Sullivan]. This entire aspect of the process violates constitutional due process considerations and makes it clear that [Sullivan] was denied fundamental fairness in several ways."

Sullivan also contended that the BSS decision "ignored virtually all of the evidence." Sullivan stated that it had conducted further investigation following the BSS hearing, which supported the conclusion that the removals occurred in error. In support of this contention, Sullivan submitted the declaration of another arborist, Gregory Applegate, whom Sullivan retained because Wallace was unavailable. Applegate opined that the removal of the trees was unintentional, based on the difficulty in correctly identifying trees on the "jungle-like" property, the likely confusion from the trees being marked with three sets of tags for different purposes over the years, and the fact that only three trees were removed by mistake, while four trees permitted for removal were not removed. Applegate stated that he discussed with Gonzalez in April 2016 the procedures Gonzalez used to mark the trees

---

[6]    We discuss these emails in further detail below, together with additional discovery Sullivan received after the BPW hearing.

for removal. Applegate opined that "a good effort was being expended to cut only the correct trees. But, given the presence of three different sets of tree tags, even I found it difficult to tell which trees were tagged for which permit." Applegate also disagreed with the BSS finding that the unpermitted removal of tree number 5 was significant to the properties, contending that the permitted removal of tree number 6 would have resulted in "significant impacts to tree number 5," thus likely causing the latter's eventual demise.[7] He also disagreed with the BSS finding that it was easy to tell the difference between tree species.

Sullivan also submitted a declaration from Larry Gray, a civil engineering expert, who had been involved in the planning process for the project since 2001. Gray opined that the project design was incompatible with the hillside ordinance adopted by the City after the project had been approved, in support of Sullivan's argument that any revocation of permits would permanently shutter the project. Gray disagreed with the BSS conclusion that tree number 5 was removed intentionally to provide better access to the site or enable easier development, noting tree number 6 impeded access but was not removed. He therefore concluded that there was no benefit to removing tree number 5 but leaving tree number 6.[8]

Contractor Gonzalez also submitted a declaration, providing additional details regarding the tree removal. He stated that prior to proceeding with the job, he made sure Sullivan had a valid permit to cut down the trees. He also walked the site a few days before the removals and reviewed the tree map, which included numbers corresponding to each tree to be cut down and

---

[7] We note that in the 2012 tree report, Wallace stated that the impact to tree numbers 5 and 30 from the planned construction would be "minor."

[8] We note that Sullivan has not claimed that it intends to permanently leave standing the four trees (including tree number 6) that were permitted for removal but were not removed in September 2014. Indeed, Sullivan has presented evidence that removal of tree number 6 was necessary for construction of the driveway for the residences.

13

preserved. He also had a copy of the list from the tree cutting permit, which identified which tree numbers would be cut down.[9]

Gonzalez stated that he and his assistant walked the entire site. Gonzalez called out the number of each tree from its tag, then his assistant reviewed the list and told him whether that tree was designated as one to be cut. Gonzalez then marked the trees to be cut with pink tape. On September 29, 2014, he arrived with his brother and an assistant, and they began cutting the trees marked with pink tape. After cutting a tree, Gonzalez would place a stake into the ground next to the stump, and move the tree tag and pink tape from the tree onto the stake.

As with the BSS review, multiple neighbors and community members submitted letters supporting revocation of Sullivan's permits. The neighbor group also submitted additional materials to the BPW. In a letter from the president of the neighbor group, who was also an architect, he argued that the removal of tree number 5 was done intentionally by Sullivan "in order to provide site access to the heavy equipment which it delivered to the site October 1, 2014." The letter enclosed and discussed photos purporting to show how the location of tree number 5 would make a route around it nearly impossible. It also discussed how Sullivan removed the stump and accessed the site with heavy equipment via the cleared pathway.

The neighbor group also submitted a second report from arborist Scow, responding to Sullivan's submission and declaration. Based on a site visit in May 2016, Scow opined that, with the removal of tree number 5, "there is much easier access to the site from the street than there would have been if the tree was not removed." He noted obstacles to accessing the site on either side of tree number 5, whereas the slope immediately behind the tree was "relatively flat when compared to the alternatives on either side." He also disagreed with Applegate's opinion regarding the ease of a mistake, noting that the tree tags were "clearly distinguishable from each other."

In addition, the neighbor group submitted the declaration of their own construction expert, who opined that the project was substantially facilitated

_____

[9] From the evidence presented by Sullivan, it appears that Gonzalez had a copy of the tree list from the PTR, which identified the trees to be removed by number and first letter of species type.

by the removal of tree number 5. He also stated that for such a "large and environmentally sensitive raw land clearing project[,] it is extraordinary that the preventive measures did not include the active onsite participation of the consulting Project Arborist."

The BSS submitted a recommendation report to the BPW prior to the hearing, recommending that the board deny Sullivan's appeal. The report was signed by Lorenzen, on behalf of Sauceda. In the report, the BSS stated that it had "determined an administrative hearing should be held with [Sullivan] prior to making its decision" whether to invoke section 46.06. The report stated that, following the hearing, the BSS "deliberated the information obtained from site investigation and material put forth by attendees of the Administrative Hearing. The Bureau decided to invoke LAMC Sec. 46.06 and therefore request the DBS revoke existing building permits and withhold future building permits for a period of five years." The report also set forth the BSS's finding that Sullivan "was fully aware of the Protected Trees on the parcels owned by them, the need to protect the Protected Trees, and further had the opportunity to preserve the Protected Trees. Nevertheless, [Sullivan] willfully directed the contractor to remove the subject trees or through the negligence of [Sullivan's] contractor the subject trees were removed. Therefore, the Bureau requests the Board of Public Works deny [Sullivan's] appeal."

### 2. *BPW appeal hearing*

The BPW held its hearing on Sullivan's appeal on June 24, 2016. The hearing was presided over by BPW president Kevin James and attended by the other four board members, Monica Rodriguez, Heather Repenning, Michael Davis, and Joel Jacinto.[10]

At the start of the hearing, James explained that first, Lorenzen would speak on behalf of the BSS, to "provide a bit of background, as well as summarizing his letter of determination." Lorenzen stated that he was going to briefly give a "summary of the issues," on behalf of the BSS. Lorenzen discussed Sullivan's application for the tree removal permit and noted that the BSS reviewed the PTR, visited the site, and "actually, with what we had

_____

[10] None of these board members was on the board when it approved Sullivan's permit in 2014.

15

been supplied at that time . . .validated the report." The BSS approved the removal of 56 trees and issued the permit. Lorenzen stated that the BSS was not involved with the project again until December 2015, when it reinspected the location and determined that three unpermitted trees were removed.

Lorenzen recounted that the BSS held its administrative hearing, after which, the bureau "reviewed all the materials that it had received during that hearing. . . . And at the end of that review, we made a determination that, in fact, these trees had been removed without a permit. That the removal of those trees had been known by the Applicant. That the number and size of trees that were removed was significant." Lorenzen noted that the sycamore was "probably in excess of 70 years old," and "one of the largest trees, if not the largest," on the property, and was also "located at the very front of this property. It's the first tree you see when you approach this property." He also stated that all three trees were "healthy and vital and in good condition." Lorenzen reported his conclusion that Sullivan "had knowledge of these trees not being on the permit. In fact, during the hearing, they . . . actually told us that the process through which they went to make sure this did not happen." Lorenzen recounted the process used by Sullivan and reported that, despite those procedures, tree number 5 was removed instead of tree number 6, a coast live oak "in very close proximity," which Sullivan claimed was a mistake. According to Lorenzen, the BSS "reviewed - - and we did extensive discussions about this was if - - even for a non-tree person to mistake a large California Sycamore from a Coast Live Oak is a big mistake. These trees, their form is completely different. The Sycamore was a very tall, more colander [*sic*] tree and the Coast Live Oak was not nearly as tall and more of a spreading structure." As such, "we came to the finding that, in fact, given all of the things they had done to make sure this did not happen, and the fact that this tree is - - these trees are wildly (inaudible) in form, that this didn't happen by accident. That somebody would have had to make the decision to take that California Sycamore down instead of the tree which was left."

Lorenzen also reported the BSS findings that the removed trees "were significant to the property because of their size and location." He acknowledged that the number illegally removed relative to the total number

16

was not hugely significant, but that the sycamore was significant, as there was only one other sycamore on the property. Lorenzen also stated that "perhaps the largest reason" that the bureau was recommending a five-year penalty, was "the fact that the Bureau truly believes that [Sullivan] knew what they were doing. So there was actually intent to take down the wrong tree, which, in fact, they did."

Following Lorenzen's presentation, council member Bonin spoke, stating that he wanted to "vigorously support" the BSS determination. He argued that Sullivan's claim of mistake was "bogus and not credible." Numerous members of the public also spoke, all in support of revoking the permits.

Sullivan's counsel gave a lengthy presentation including a PowerPoint presentation, again arguing that the trees were cut by mistake and that the penalty was "unfair and extreme." He emphasized that a small percentage of trees were removed without a permit, that two of the three trees (numbers 29 and 30) were not significant in size or age, and that tree numbers 5 and 30 "were both going to be damaged anyway" because of the necessary construction nearby.

Sullivan presented testimony from Gonzalez, Applegate, and Gray, consistent with their declarations. Gonzalez testified that he did not remove the three unpermitted trees intentionally. He blamed the procedure he used with his assistant to mark the trees for the mistake. Gray testified that he had been involved with the property for about 30 years and could see "absolutely no reason why the tree should have been cut down other than a mistake." He disputed that it would have assisted getting construction equipment onto the site. One of the owners testified, reiterating the large amount of money and effort spent on the project and apologizing for the "unintentional" tree removals.

Attorney Kracov argued on behalf of the neighbor group. He noted that during the prior CEQA process for the property in 2007 and 2011, Sullivan had stated that 25 to 27 protected trees would be removed, rather than the 56 requested in 2014 for the removal permit. He also argued that Sullivan needed to get its heavy construction equipment onto the property and removing tree number 5 facilitated that entry. Commissioner Repenning

17

asked Sullivan's counsel to respond to the photos presented by Kracov and the claim that removal of tree number 5 provided easier access for the equipment to the site. Sullivan's counsel cited to Gray's testimony that the company had been able to access the site several years earlier with equipment without removing trees.

President James asked Kracov to respond to Sullivan's argument that three of the four factors were not supported. Kracov asserted that the findings of BSS staff "are fully supportable." James also asked about the fact that the CEQA documents identified 25 protected trees, while the 2014 PTR identified 56.[11] Kracov argued that the BPW should look at the totality of the circumstances, including Sullivan's "pattern and practice of . . . blowing through their permits," including CEQA, the water board, and the tree permit, as relevant to intent. In response to a question from Commissioner Repenning regarding the water issues, Sullivan's counsel acknowledged that it did not have all required erosion control mechanisms in place and that it was still working on resolving one certification issue.

In addition to testimony from witnesses and arguments by counsel for both Sullivan and the neighbor group, Commissioners Repenning, Davis, and Jacinto, as well as President James, asked multiple questions of witnesses and the attorneys throughout the hearing. Sullivan was then permitted to present a rebuttal argument. At one point, Sullivan's counsel asserted again that there "was nothing to be gained by taking out" tree number 5. James responded, "Not if you're caught."

At the conclusion of argument, James thanked Sullivan's counsel and experts, and stated: "I'm just going to put this out in the open and on the table - - I don't think it's any surprise - - maybe to somebody, but it shouldn't be - - where I stand on this. [¶] So before I entertain further comments, I had a couple questions just so I can get myself kind of clear on the direction I think I want to try and go myself." Turning to Kracov and deputy city attorney Jordan, he continued, "if I wanted to affirm the action of Mr.

---

[11] Sullivan's counsel later stated that he was not sure the reason for the difference in numbers. During the hearing on the writ before the trial court, Sullivan's counsel asserted that the CEQA documents were prepared for a "different project" on the properties.

18

Lorenzen and deny the appeal, there are some things that - - that need to be determined in this hearing. And from your perspective, I'd like to know what you think those things are." James first questioned Jordan regarding whether the BPW needed to make findings that construction had commenced and/or that permit revocation would deprive Sullivan of economically beneficial use of property. Next, he stated "we have to make a finding of intentional conduct. I can't get away from … to me, from where I sat and I - - I know [Sullivan's counsel] is aware of this - - there are e-mails in the record from myself to Mr. Lorenzen, from Mr. Kracov to me, requesting the inspection of . . . the property to determine whether or not the permits have been followed. [¶] And I'm just going to tell my colleagues right now it is no surprise to me - - I was not surprised in the least to find out that . . . number one, that the permit had been violated and that they took down trees that were not permitted. No surprise; and number two, that they took down a tree that was significant or at least arguably significant on the property . . . That's before the inspection even took place. And that's because of the pattern of contact [*sic*] that we've seen related to this project." James cited to the fact "that they came to our predecessors with any environmental document for 25 trees and came for a permit for 56." He continued that "it flies in the face of . . . anything reasonable to think that that tree, that prominent, in that key location was, 'Oh, darn it. It was an accident and we didn't find out until they told us.' [¶] I . . . don't buy it. And it was predictable, unfortunately."

James also discussed the conclusion of the BSS report. It found that given the measures Sullivan had in place, "to ensure you [Sullivan] were doing the right thing, indicates that it clearly wasn't an accident," which he found was a "completely reasonable" conclusion. Regarding the number of trees removed, James also noted the "percentage of canopy that was removed here" from tree number 5 and agreed that the BSS "is still within its legal authority to . . . make the determination that it did." James also stated that "we can't just walk away with a mitigation" because of the message it would send to encourage others to violate the law where, even if they were caught, they would just have to "pay some mitigation money to City Plants or plant a few trees." Instead, he cited "all the challenges that we have where we are

19

trying to . . . preserve first, grow second - - an urban canopy in the second largest city in America." James indicated he would "entertain any more questions or comments" but moved to affirm the position of the BSS, which was seconded by Commissioner Rodriguez.

Commissioner Davis stated that he did not know if Sullivan "intended to do it or if it was a mistake," but he was concerned about the community and the trees that could not be replaced. He concluded that the trees were "negligently" removed, but believed that Sullivan had to "assume the responsibility for the actions of the subcontractors that they hire[d]." He therefore stated that he would support the motion to affirm the BSS's decision.

Commissioner Repenning stated that she recognized "the significance" of revoking the permits and did "not take this lightly." She reported that she had "discussions with our staff, with our legal counsel, with the council office. I had discussions with representatives of the developer and with representatives of the community. I keep coming back to the first conversation I had about this issue, which was with Ron Lorenzen. Ron Lorenzen is someone that I have the utmost respect for. He's someone who has been doing this for so many years for the city. I know he cares deeply about our urban forest and he just – he's a true professional, and I know he didn't take his recommendation lightly in this either. And so I said to him, you know, 'Ron, what – what's going on here?' And he told me about this sycamore and he said, 'Heather, there's no way they could have taken that out accidentally.' And so that's what I feel because . . . I take your advice very, very seriously. And seeing what we've seen, it's also what I feel." Repenning continued that it "gives me no joy to say that I support our staff's recommendation today," and that she would usually prefer to see mitigation, but "I don't think that that's the right course of action for us here today. I think that today we need to send a signal about what it means to work with us. . . . I don't believe that rules have been followed in the development of this project."

The BPW unanimously voted to deny the appeal and adopted the BSS's recommendation report on June 24, 2016. On August 10, 2016, the BPW formally requested that the Department of Building and Safety revoke any

20

building permits issued for the properties and withhold issuance of future building permits for the properties for five years, ending September 29, 2019.

## IV. *Writ Proceedings*

### A. *Pleadings*

Sullivan filed a complaint against the City in federal district court in September 2016, alleging causes of action for violation of due process, violation of the excessive fines clause, violation of the equal protection clause, slander of title, a state law petition for writ of mandate, and declaratory relief. The City moved to dismiss the complaint. The district court denied the motion as to Sullivan's due process, writ of mandate, and declaratory relief claims, but granted dismissal of the other three claims. In April 2017, the court granted the City's motion to abstain, staying the remaining claims to allow Sullivan to bring a claim for an administrative writ in state court.

On May 9, 2017, Sullivan filed a verified petition for writ of administrative mandamus in state court. Shortly thereafter, Sullivan filed a first amended verified petition for writ of mandate and complaint, the operative petition. Sullivan alleged that the City's decision to revoke its permits "was made without providing a fair hearing to [Sullivan] and is not supported by findings sufficient to support the decision or substantial evidence in the record." In particular, Sullivan alleged that after its contractor mistakenly removed three unpermitted trees, the City convened a "staged show trial before a kangaroo court . . . where the outcome was pre-ordained." Sullivan further alleged that Lorenzen and James, who presided over the two administrative hearings, "had led and conducted the investigation into the tree removal, had previously announced they were committed to invoking the drastic remedies supplied by [LAMC section 46.06] before the hearings took place, and were personally embroiled in the controversy and politically motivated and pressured to deprive [Sullivan] of its property rights."

In its first cause of action, Sullivan sought a writ of mandate pursuant to section 1094.5 directing the City to set aside the penalty imposed under LAMC section 46.06 and to reinstate Sullivan's building permits. Sullivan also alleged a second cause of action for writ of mandate pursuant to section 1085, alleging that the City improperly revoked its grading permits along

21

with its building permits in excess of its authority under LAMC section 46.06. Finally, Sullivan alleged a third cause of action for inverse condemnation.

**B.    *Discovery***

Sullivan propounded written discovery on the City, to which the City objected as inappropriate for a writ proceeding. Sullivan moved to compel further responses to its written discovery and sought leave to take seven depositions. The court denied the motion as overbroad without prejudice.

Sullivan filed a second motion for leave to take discovery, seeking to depose James and Lorenzen and to serve document requests. Sullivan also filed a motion to augment the record with 209 documents it had received from the City in response to Public Records Act requests. After a hearing on both motions, the court denied Sullivan's motion to serve document demands. The court also denied Sullivan's request to depose James and Lorenzen on eight broad categories, but permitted narrow questioning on certain specific emails.

The court granted Sullivan's motion to augment the record as to seven email chains (totaling 12 pages of emails), finding that those documents had been produced by the City after the BPW hearing and could have some relevance to Sullivan's bias claim. The court denied the remainder of the motion to augment.

Sullivan deposed Lorenzen and James in late 2018. Sullivan then filed a motion to compel further deposition testimony from James and a motion to augment the administrative record with the full deposition transcripts and additional documents.

The court denied Sullivan's request to take an additional deposition of James or to compel responses to questions he was instructed not to answer. The court granted Sullivan's request to augment the record with a few excerpts from the deposition transcripts for Lorenzen and James. Sullivan conceded that the exhibits it sought to add to the record had also been included in its prior motion to augment, which the court had denied.[12] The

---

[12] Despite the trial court's repeated denial of Sullivan's request to augment the record with hundreds of pages of emails, Sullivan discusses and cites to these emails at length in its respondent's brief on appeal. Sullivan

22

court denied augmentation as to these exhibits. The court also awarded sanctions to the City.

## C. *Briefing and summary of relevant documents*

The parties filed merits briefs and requests for judicial notice. Sullivan relied heavily on emails produced by the City in response to Public Records Act requests. Sullivan received some of the emails before the BPW appeal hearing, but did not receive others until after that hearing. It also relied on the deposition testimony from Lorenzen regarding those emails. We summarize this evidence, which was either part of the administrative record before the BPW or in the augmented administrative record before the trial court.

On September 22, 2015, attorney Kracov emailed James, requesting on behalf of the neighbor group that the BPW inspect the properties to ensure Sullivan was in compliance with its permit and was not removing unpermitted trees. James responded, copying Lorenzen, Greg Good (Director of Infrastructure for the mayor's office), Ted Jordan (deputy city attorney), and another city employee, stating that he had spoken with the BSS and Lorenzen had "agreed to set the process in motion for the inspection." Lorenzen responded to the group that he would "let you know once the inspection has been performed."

On December 3, 2015, James emailed Lorenzen asking for the "status" of the site inspection, noting that "Gideon [Kracov] has been pinging me about it." Lorenzen responded, "I will ensure that staff gets to the location on

acknowledges that these emails are not part of the administrative record, but contends that they are cited "to give this Court the full picture of the evidence before the Trial Court." These documents were rejected by the trial court and were not part of the administrative record; we therefore do not consider them. Moreover, although Sullivan contends in a footnote that "the trial court erred" by refusing to augment the record with these documents, it has failed to make any showing of error. (See, e.g., *In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 1004 ["appellate court can treat as waived or meritless any issue that, although raised in the briefs, is not supported by pertinent or cognizable legal argument or proper citation of authority"].) Thus, Sullivan's inclusion of these documents was improper and unhelpful to our consideration of the relevant facts on appeal.

Monday and reports back." There followed a series of emails between Friday, December 4 and Monday, December 7, 2015, involving Kracov, James, Lorenzen, and Sara Nichols (a member of the neighbor group. On December 4, Kracov sent Lorenzen the tree map and removal permit for the properties and queried, "was more than one sycamore removed? Permit said just one." The following day, Lorenzen responded to the group, "Will inspect on Monday and let all know." Kracov responded on December 7, reporting that the sycamore, tree number 5 on the map, "was not permitted to be cut."

Lorenzen emailed James on December 8, 2015 with the results of the inspection, confirmed that there were 117 protected trees on the properties, 56 of which were permitted for removal, that tree number 6 had been permitted but not removed, and that Sullivan had removed three unpermitted trees. Lorenzen stated that the City had three options in response: (1) "Require extreme replacement for the three unpermitted removals (ie full inch/inch replace)"; (2) criminal charges regarding the unpermitted removals, which Lorenzen reported in the past meant "a max fine of $1000/illegal removal"; or (3) "Invoke LAMC Sec 46.06 and void all existing permits and not issue any permits for a period up to ten years." Lorenzen continued, "I will be happy to communicate with [Kracov] (but not discuss options for now). Let me know if you would like to discuss." James emailed in response, "Let's discuss this today, before you speak to [Kracov]. Thank you for having this done."

James forwarded Lorenzen's December 8, 2015 email to Greg Good at the mayor's office the same day. Good responded, "Again, this is amazing – and you have several options. What are you thinking at this point?"

On December 10, 2015, Kracov emailed Chad Molnar, chief of staff for council member Bonin, stating that "BPW just did tree inspection. Developer cut down 3 protected trees including a huge sycamore without permits. The penalty for this is harsh if the City does something about it. . . . My clients want the City to step up against this bad activity!" Kracov forwarded that email to James the same day, stating "Fyi."

A few hours later, Molnar emailed Lorenzen that some constituents reported that the inspection revealed unpermitted removal. Molnar also stated that Bonin "has been worried about this project for some time, and

24

particularly worried that the owners were removing protected trees without a permit. Could you give me a call when you get a chance to discuss? We're interested in knowing if it is true that the inspector found unpermitted protected tree removals, and if so then what the enforcement action will be?" Lorenzen responded with his contact information and that he "look[ed] forward to discussing." The following day, Molnar emailed Lorenzen, "Thanks for the call yesterday, it was very helpful. I wanted to give you a heads up that I briefed CM Bonin, and he believes strongly that at this point we need to revoke all permits, given the violation. [¶] We can discuss more once you've had a chance to meet with your team, but I wanted to make sure to let you know what [Bonin] wants to do." Lorenzen responded, "Understood. I am in agreement[.] Will keep you abreast."

In the admitted excerpts of his 2018 deposition, Lorenzen discussed these December 10, 2015 emails with Molnar. He testified that he did have a phone call with Molnar as referenced in the email. Lorenzen testified that he and Molnar discussed the BSS's options in response to the tree removals, but he did not specifically recall what they said. Lorenzen explained that when he wrote to Molnar that he was "in agreement," he meant agreement about "the options available." He testified that he was agreeing "to all of the things we had discussed, not specifically what they were stating [that Bonin wanted to revoke permits]. No decision had been made." Lorenzen testified that he did not recall other details of his call or whether he and Molnar had any other conversations.

Molnar emailed James on December 15, 2015 to give a "heads up that an Urban Forestry inspector confirmed last week" that three unpermitted trees were removed from the property. Molnar continued, "the unpermitted removal of those protected trees now allows the city to enforce against the applicant, including revoking all existing building and construction permits for the project, and banning the applicant from applying for permits for 10 years. Councilmember Bonin feels strongly that we need to quickly move ahead with revoking those permits. We've been in touch with Ron Lorenzen, and he is working through the process with the City Attorney. [¶] [Bonin] mentioned that you wanted to help with this as well, so he wanted to make sure I gave you the heads up on what's happening. [¶] It is our hope that we

can quickly move forward with revoking the permits, before the applicant causes any more damage."

Lorenzen emailed James on June 16, 2016, prior to the June 24 BPW hearing, attaching the BSS recommendation. The email states: "I wrote this as simply and straightforward as possible."

In his 2018 deposition, James testified that he did not speak to Molnar about enforcement options other than in the email produced. He also denied speaking directly with Bonin on the issue other than on the record at the BPW hearing. James testified that he never indicated a preference for an enforcement option in any conversations with Kracov or Good (from the mayor's office). He stated that the "only time I discussed in detail the tree cutting of the sycamore tree with anybody was in the public hearing [before the BPW]." James also stated that he did not discuss with Kracov or others outside of that hearing that he thought the tree cutting was intentional, and that he came the conclusion that it was not accidental during the hearing.

### D.  *Decision*

Following a hearing, the court issued its written decision on August 12, 2019. he court first considered the level of due process applicable to the administrative hearings, concluding Sullivan was entitled to "notice and an opportunity to be heard before neutral decisionmakers" but not to cross-examination or pre-hearing discovery. The court found that Sullivan was not denied notice or the opportunity to be heard. The court rejected the City's argument that Sullivan had failed to raise the issue of bias during the administrative proceedings, finding that Sullivan had adequately claimed bias or, as to some arguments, was excused from doing so because it could not have raised it at that time.

Turning to the substantive bias issue, the court examined Sullivan's contentions that Lorenzen and James "were personally embroiled in the matter," that they were biased, and that they "had conflicting roles as prosecutor and judge." The court noted that Sullivan was required to show "an unacceptable probability of actual bias" by those with "actual decisionmaking power." While a decisionmaker who had become "personally 'embroiled' in the controversy" would meet that standard, the court rejected Sullivan's contention that Lorenzen or James had become personally

embroiled due to public and political pressure surrounding the tree removals. The court found that Sullivan had submitted "no evidence" that Lorenzen or James had a personal financial stake in the matter or harbored personal animosity toward Sullivan, or that the public pressure "was such to cause an unacceptable probability of bias."

Next, the court examined Sullivan's claim that Lorenzen and James had conflicting roles in the investigation and adjudication of the unpermitted tree removals. The court noted that combining investigative and adjudicative functions, alone, was not a denial of due process, nor would prehearing statements or opinions necessarily disqualify an official. The court rejected the City's argument that any bias by Lorenzen was irrelevant because he did not render the final decision against Sullivan. The court found that Lorenzen did not simply initiate the proceedings or investigate the removals, he also served as the adjudicator over the BSS hearing, thus any bias by Lorenzen as the BSS hearing officer was relevant.

Given Lorenzen's role both "as an investigator, and a decision-maker adjudicating the matter and the Bureau level," the court found it "problematic" that Lorenzen engaged in discussions with Molnar (of council member Bonin's office) as part of the BSS investigation. In particular, the court noted that Lorenzen's statement that he was "in agreement" could "plausibly be read to commit tentatively to a general sanction (permit revocation)," or could "plausibly be read as agreeing that further discussion was needed." The court also found it "significant that James participated in the investigatory process leading to the BSS decision, then sat on the appellate panel determining whether that decision should be upheld." The court cited James' email discussions with Lorenzen, Bonin's office, and Kracov during the investigatory process, as well as James' comment during the BPW hearing that "I don't think it's any surprise . . . where I stand on this," as "arguably suggest[ing] that he had, prior to the hearing, formed an opinion on the case and in fact communicated it to other persons."

Additionally, the court found that evidence of pre-hearing communications between Lorenzen, James, and commissioner Repenning raised concerns. Noting that Lorenzen and James communicated frequently during the investigation process and that Lorenzen forwarded the BSS report

directly to James prior to the BPW hearing, the court found that this evidence suggested Lorenzen "viewed his decisions as subject to approval by James." The court also pointed to the statement by Repenning at the BPW hearing that she was relying on her prior discussion with Lorenzen, as it suggested that Repenning was "relying not on the BSS report or its findings, but on a private conversation with Lorenzen." The court found these communications between Lorenzen and Repenning were "significant" because it meant that Lorenzen had made the initial decision on behalf of the BSS and then advised Repenning, one of the appellate decision makers, about the facts underlying that decision.

The court found that the "significant property interest involved – a ban on building permits for the property for 5 years – causes the court to more closely scrutinize the procedures involved that it would in a typical land use permit or denial hearing." As such, the court concluded that "[u]nder the facts of this case, in order to satisfy due process or fair hearing requirements . . . a greater separation between the investigative and adjudicatory functions was required. Lorenzen, investigator and adjudicator, made at least one statement showing some pre-judgment of the matter. He was in frequent contact with James, who sat on the Board deciding the appeal of the BSS decision. James thus had a role in both the investigation and the appeal." The court cited James' statements at the hearing, "suggesting pre-judgment," as well as Repenning's statements, which showed that "Lorenzen had ex parte communication with at least one other Board member (besides James) which heavily influenced the Board member's decision. As a whole, these facts show an unacceptable probability of bias in the decision-making process, depriving [Sullivan] of a fair trial." The court concluded that it would issue a writ directing the City to set aside the administrative decision and sanction, but would not, as Sullivan requested, order the City to reinstate Sullivan's permits.

On August 20, 2019, the court amended its decision to add a finding on the second cause of action regarding grading permits. The court found that the "City's revocation of grading permits flowed from the administrative decision under the PTO. . . . The court's reasoning for the Section 1094.5 writ disposes of the second cause of action for writ of ordinary mandate and

28

render's petitioner's remaining contentions for the second cause of action moot. The writ directing City to set aside the administrative decision and sanction, includes setting aside the revocation of the grading permits. The writ will not direct reinstatement of the grading permits for the reasons discussed above." Sullivan subsequently dismissed without prejudice its third cause of action for inverse condemnation.

The court entered judgment granting peremptory writ of mandate on January 23, 2020. The writ of mandate ordered the City to "set aside, vacate and annul" the March 14, 2016 BSS decision and the June 24, 2016 BPW decision, including the revocation of any and all permits issued regarding the properties. The court ordered the matter remanded for further proceedings, allowing the City to hold a further hearing, but not requiring it.

The City timely appealed. Sullivan subsequently filed a cross-appeal from the judgment regarding the court's dismissal of its grading permit claim.

## DISCUSSION

Sullivan contends that the City failed to provide a fair administrative hearing before revoking its building permits. It argues that administrative decisionmakers Lorenzen and James were personally biased against the project due to political pressure, and that they both committed to revoke Sullivan's permits prior to the hearing process. In addition, Sullivan contends that Lorenzen and James had overlapping roles throughout the investigation and adjudication, rendering them incapable of providing the fair hearing required. The City counters that Sullivan forfeited its bias arguments and that any bias by Lorenzen is irrelevant because the scope of our review is limited to the fairness of the BPW appeal hearing. On the merits, the City contends that Sullivan failed to provide concrete evidence of bias, and thus the trial court erred in concluding that the administrative process was unfair. We disagree with the City as to the scope of our review. However, we agree with the City that there is insufficient evidence of bias to establish a violation of due process.

### I.  *Legal Principles*

"A trial court may issue a writ of administrative mandate where an agency has (1) acted in excess of its jurisdiction, (2) deprived the petitioner of

29

a fair hearing, or (3) committed a prejudicial abuse of discretion." (*Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1169 (*Clark*), citing § 1094.5, subd. (b).) At issue here is Sullivan's claim that the City failed to provide a fair administrative hearing before revoking its building permits.

"When, as here, an administrative agency conducts adjudicative proceedings, the constitutional guarantee of due process of law requires a fair tribunal . . . in which the judge or other decision maker is free of bias for or against a party." (*Morongo Band of Mission Indians v. State Water Resources Control Bd.* (2009) 45 Cal.4th 731, 737 (*Morongo*); see also *Haas v. County of San Bernardino* (2002) 27 Cal.4th 1017, 1025 (*Haas*) ["When due process requires a hearing, the adjudicator must be impartial."'].) "Unless they have a financial interest in the outcome [citation], adjudicators are presumed to be impartial." (*Morongo, supra,* 45 Cal.4th at p. 737, citing *Withrow v. Larkin* (1975) 421 U.S. 35, 47).

The "standard of impartiality required at an administrative hearing is less exacting than that required in judicial proceedings." (*Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 483 (*Nasha*), quoting *Gai v. City of Selma* (1998) 68 Cal.App.4th 213, 219; see also *Haas, supra,* 27 Cal.4th at p. 1027 ["due process allows more flexibility in administrative process than judicial process"].) "Administrative decision makers are drawn from the community at large. . . . Holding them to the same standard as judges, without a showing of actual bias or the probability of actual bias, may discourage persons willing to serve and may deprive the administrative process of capable decision makers." (*Gai v. City of Selma, supra,* 68 Cal.App.4th at p. 233.)

Accordingly, in order to prevail on a claim of bias violating fair administrative hearing requirements, the petitioner must establish "'an unacceptable probability of actual bias on the part of those who have actual decisionmaking power over their claims.'" (*BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1236 (*BreakZone*); see also *Nasha, supra,* 125 Cal.App.4th 470, 483.) "A party seeking to show bias or prejudice on the part of an administrative decision maker is required to prove the same 'with concrete facts: "'[b]ias and prejudice are never implied and must be

established by clear averments."'"" (*Nasha, supra*, 125 Cal.App.4th at p. 483, quoting *BreakZone, supra*, 81 Cal.App.4th at p. 1237.)[13]

Moreover, "'[b]y itself, the combination of investigative, prosecutorial, and adjudicatory functions within a single administrative agency does not create an unacceptable risk of bias and thus does not violate the due process rights of individuals who are subjected to agency prosecutions.'" (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 221.) As our Supreme Court explained: "To prove a due process violation based on overlapping functions thus requires something more than proof that an administrative agency has investigated and accused, and will now adjudicate. '[T]he burden of establishing a disqualifying interest rests on the party making the assertion.' [Citation.] That party must lay a 'specific foundation' for suspecting prejudice that would render an agency unable to consider fairly the evidence presented at the adjudicative hearing [citation]; it must come forward with 'specific evidence demonstrating actual bias or a particular combination of circumstances creating an unacceptable risk of bias' [citations]." (*Ibid*.) "While the 'degree or kind of interest . . . sufficient to disqualify a judge from sitting "cannot be defined with precision"' [citation], due process violations generally are confined to 'the exceptional case presenting extreme facts' [citation]." (*Id*. at p. 219.)

Whether Sullivan received a fair administrative hearing is a legal question we review de novo. (*Nasha, supra,* 125 Cal.App.4th at p. 482; *Clark, supra*, 48 Cal.App.4th at p. 1169.) We affirm the trial court's findings on any "foundational matters of fact" if "supported by substantial evidence. However, the ultimate questions, whether the agency's decision was . . . unlawful or procedurally unfair, are essentially questions of law. With respect to these questions the trial and appellate courts perform essentially the same function, and the conclusions of the trial court are not conclusive on appeal." (*Clark, supra*, 48 Cal.App.4th at p. 1169, quoting *Rosenblit v.*

---

[13] Sullivan argues that we must also consider the extent of the property interest at issue, and that its interest was significant given the expenses and time incurred and the severity of the penalty imposed. We do not disagree. However, as Sullivan has acknowledged, the standard it must meet to establish bias remains the same.

*Superior Court* (1991) 231 Cal.App.3d 1434, 1443; see also *Petrovich Development Company, LLC v. City of Sacramento* (2020) 48 Cal.App.5th 963, 972-973 (*Petrovich*).)

Sullivan contends, without citation to authority, that application of this standard means that "the question of whether the City's hearing was tainted with an unacceptable probability of bias is a question of fact." We disagree. As detailed in the cases above, whether there was an unacceptable probability of bias by the decisionmakers is the standard by which the court decides the ultimate question of the fairness of the hearing; application of this standard is thus a question of law for our de novo review, not a foundational factual question as Sullivan suggests.

## II. *Analysis*

### A. *Forfeiture*

As an initial matter, we reject the City's contention that Sullivan forfeited its bias objections by failing to sufficiently raise the issue in its administrative appeal before the BPW. The trial court found that Sullivan had raised a bias argument in its appeal materials submitted to the BPW. Further, to the extent it did not, the court found Sullivan was excused from doing so because it did not receive all of the relevant emails from the City until after the BPW appeal hearing, nor could it have previously cited statements made by board members during the hearing.

We agree. "When a litigant suspects bias on the part of a member of an administrative hearing body, the issue must be raised in the first instance at the hearing. [Citations.]" (*Attard v. Board of Supervisors of Contra Costa County* (2017) 14 Cal.App.5th 1066, 1083.) Here, in its submission for the BPW appeal, Sullivan outlined the emails it obtained from the City in response to its records requests, including several involving Lorenzen and James, and argued that the City showed "blatant favoritism" toward project opponents, resulting in unfair administrative proceedings and a violation of Sullivan's due process rights. This was sufficient to preserve Sullivan's arguments regarding bias. Moreover, as the trial court noted, during the writ proceedings Sullivan relied heavily on evidence of purported bias that it could not have discovered prior to the BPW hearing, including emails subsequently produced by the City and statements made by James and Repenning during

32

the hearing. Thus, we find no error in the trial court's conclusion that to the extent Sullivan raised additional bias arguments, it could not have diligently done so earlier. (See *id*. at p. 1084 [noting that if appellants "did not learn of the facts underlying their claim of bias until after the hearing, they might have been justified in waiting until the trial court proceedings to raise the issue"].)

**B.     *Relevance of bias at the BSS level***

We also disagree with the City's contention that any alleged bias by Lorenzen as the initial decisionmaker is irrelevant to our determination. Instead, the City asserts that the scope of an administrative writ extends only to the fairness of the *final* administrative decision—here, the BPW appeal. The trial court disagreed, citing *Haas, supra,* 27 Cal.4th 1017, which considered whether independent review can remedy an allegation of bias in an initial administrative hearing. In *Haas*, the court considered a county's practice of selecting and paying temporary administrative hearing officers on an ad hoc basis. The plaintiff asserted that this practice gave the hearing officers an impermissible financial interest in the outcome of their cases, because the officers' prospects for obtaining future ad hoc appointments depended solely on the county's goodwill. (*Ibid*.) The court noted that in cases involving an adjudicator's financial interest, as distinct from other claims of bias, the litigant claiming bias did not have to overcome the "presumption of honesty and integrity" typically afforded the administrative adjudicators. (*Id*. at p. 1026.) Applying this stricter standard for pecuniary interest claims, the court concluded that the county's practice raised an impermissible risk of bias. (*Ibid*.)

The *Haas* court also considered the county's argument that "any possibility of bias on the part of a hearing officer is cured when the Board independently reviews the administrative record and decides whether to accept or reject the officer's recommendation. The short answer to the contention is that no court has relied on this argument to uphold a decision reached by an adjudicator found to have suffered from a constitutionally significant risk of bias. Indeed, several courts have expressly rejected the argument." (*Haas, supra*, 27 Cal.4th at p. 1034, citing *Ward v. Village of Monroeville* (1972) 409 U.S. 57 (*Ward*).) The court concluded that the

"[p]etitioner is entitled to a neutral and detached judge in the first instance." (*Haas, supra*, 27 Cal.4th at p. 1034, quoting *Ward, supra*, 409 U.S. at pp. 61-62, italics omitted.)

The City argues that *Haas* is inapplicable because the court's holdings were limited to due process claims "based on allegations of systemic, pecuniary bias." We find *Haas* squarely on point and therefore binding. While the Supreme Court distinguished the standard for finding an unfair hearing based on pecuniary bias, it made no such distinction when holding that the bias of a lower-level administrative adjudicator could not be cured by a fair hearing on appeal. Indeed, the *Haas* court noted that this conclusion had been followed "in cases involving administrative tribunals," citing *Hackethal v. California Medical Assn*. (1982) 138 Cal.App.3d 435. (*Haas, supra*, 27 Cal.4th at p. 1034.) *Hackenthal* involved a claim of bias arising from overlapping administrative functions, similar to the claims made here. (*Hackethal v. California Medical Assn., supra*, 138 Cal.App.3d at pp. 445-446.)

Nor does the City's cited authority hold otherwise. The City relies on *Pomona Valley Hospital Medical Center v. Superior Court* (1997) 55 Cal.App.4th 93, 107, and *Cole v. Los Angeles Community College Dist*. (1977) 68 Cal.App.3d 785, 791-792, both of which found that alleged bias of an accuser, or an individual who initiated administrative action, was not relevant to the fairness of an administrative hearing. But neither case considered the relevance of purported bias by the *hearing officer* at an initial administrative hearing. (See, e.g., *Pomona Valley Hospital Medical Center v. Superior Court, supra,* 55 Cal.App.4th at p. 107 [noting that the purportedly biased individual was not a hearing officer at either level of administrative review, thus, evidence of his motive in initiating the proceedings was irrelevant].) Here, by contrast, Lorenzen was the adjudicator at the BSS hearing. Thus, to the extent his purported bias rendered that hearing unfair, it is not insulated from our review by the fact that Sullivan received an administrative appeal.

## C.   *Sullivan's fair hearing claim*

Sullivan contends that it did not receive a fair hearing from the BSS or on appeal to the BPW. Specifically, it argues that Lorenzen and James were

"personally embroiled" in the controversy, they pre-committed to the decision to revoke Sullivan's permits prior to the hearings, and they "maintained conflicting roles as investigators, prosecutors, and judges." The City asserts that the purported evidence of bias presented by Sullivan, and relied upon by the trial court, is vague, speculative, and cannot overcome the presumption of impartiality afforded to administrative decisionmakers. We agree with the City that Sullivan failed to meet its burden to "come forward with 'specific evidence demonstrating actual bias or a particular combination of circumstances creating an unacceptable risk of bias.'" (*Today's Fresh Start, supra,* 57 Cal.4th at p. 221.). We therefore reverse the trial court's order issuing an administrative writ.

### 1. *Personal embroilment*

Personal embroilment in a dispute will void the administrative decision. (*Clark, supra,* 48 Cal.App.4th at p. 1170, quoting *Applebaum v. Board of Directors* (1980) 104 Cal.App.3d 648, 657-658.) In *Clark,* for example, the court found the property owners were denied a fair administrative hearing because one of the council members was a neighbor who displayed "personal animosity" toward the owners and whose own residence would be impacted by the proposed building project. (*Clark, supra,* 48 Cal.App.4th at pp. 1172-1173.) Here, Sullivan claimed that Lorenzen and James had a personal stake in the decision because of the public outcry over the development and the City's initial decision to issue the tree permit. The court rejected this argument, finding no evidence that Lorenzen or James had a personal financial stake in the matter, harbored personal animosity toward Sullivan, or that the public pressure "was such to cause an unacceptable probability of bias." Sullivan ignores the trial court's findings of fact and simply reasserts the argument that Lorenzen and James played "personal roles in the underlying controversy" that were "too significant to be constitutionally acceptable."

We find that substantial evidence supports the trial court's factual finding that neither Lorenzen nor James held a financial stake, harbored personal animosity, or held any other personal interest in the project. Further, Sullivan cites no authority supporting its contention that public pressure over the project (absent some personal interest) would disqualify

35

Lorenzen or James from acting as impartial adjudicators.  Thus, we conclude that Sullivan failed to establish personal embroilment by any decisionmaker here.

### 2. *Precommitment to a result*

Next we turn to Sullivan's contention that Lorenzen and James committed to revoking the permits prior to the administrative hearings. Prehearing statements or opinions regarding the subject matter of an administrative hearing do not necessarily disqualify a decision maker.  (See *City of Fairfield v. Superior Court* (1975) 14 Cal.3d 768, 782; *Clark, supra*, 48 Cal.App.4th at p. 1170, quoting *Applebaum v. Board of Directors, supra,* 104 Cal.App.3d at pp. 657-658 ["neither prior knowledge of the factual background which bears on a decision nor prehearing expressions of opinions on the result disqualifies an administrative body from acting on a matter before it"].)  Whether those statements cross the line into impermissible advocacy by the decision maker depends on the specific circumstances.

In *Petrovich, supra*, 48 Cal.App.5th at p. 974, a developer alleged bias by a city council member who voted to deny its conditional use permit to build a gas station.  The court found that the evidence that the council member was also a member of the neighborhood association opposing the project, as well as a prehearing statement he made opposing the gas station, was insufficient to establish bias.  (*Ibid.*)  However, the court concluded that the council member "crossed the line into advocacy against the project" when he "took affirmative steps to assist opponents of the gas station conditional use permit and organized the opposition at the hearing."  (*Id.* at pp. 974-975.)  The court cited evidence that prior to the hearing, the council member was "counting— if not securing—votes on the City Council against the gas station," and communicating "an 'update' on that score" to the mayor.  (*Ibid.*)  The court also found it significant that the council member had prepared "talking points" that amounted to a presentation against the gas station, many of which appeared in a presentation prepared "for the mayor to use at the hearing," and coached the project's main opponent on how to prosecute the appeal.  (*Ibid.*)  Under these circumstances, the court concluded that the council member had made a prehearing commitment to a particular result and should have recused himself from voting.  (*Id.* at p. 975; see also *Nasha,*

36

*supra,* 125 Cal.App.4th at p. 483 [finding unacceptable probability of bias by planning commissioner who authored a pre-hearing article attacking the project].)

Here, at the BSS level, the court found "problematic" Lorenzen's December 2015 email to Molnar of council member Bonin's office. In that email, Lorenzen stated he was "in agreement," in response to Molnar's email discussing Bonin's opinion that "we need to revoke all permits for the project." Sullivan argues that, "standing alone," this email was sufficient evidence of precommitment by Lorenzen to establish an unacceptable probability of bias. But the trial court did not find as much; instead, it found that Lorenzen's email "could plausibly be read to commit tentatively to a general sanction (permit revocation)," or it could "plausibly be read as agreeing that further discussion was needed," and further noted that in his deposition, Lorenzen "denied that he was agreeing to any specific sanction or had made a decision." As such, the trial court did not make the factual finding that Lorenzen's subsequent explanation in his deposition lacked credibility, nor did the court find that the email definitively established precommitment. Sullivan's attempts to cast these findings as supporting bias fall short. We defer to the trial court's factual findings interpreting this evidence. Based on those findings, we conclude the emails cannot establish bias where they could "plausibly be read as agreeing that further discussion was needed."

Putting aside the email exchange with Molnar, we find insufficient evidence to support Sullivan's claim that Lorenzen committed to revoking its permits prior to the BSS hearing. The early emails among Lorenzen, James, and Kracov demonstrate that the City began its investigation after the neighbor group alleged that trees had been removed without a permit, and the subsequent emails confirm that the inspection revealed the removal of three unpermitted trees. None of these facts were in dispute, and they do not establish any commitment by Lorenzen or James to revoke Sullivan's permits as punishment for the tree removals. Indeed, Lorenzen's email to James with the results of the investigation lays out multiple options and does not suggest any preferred outcome. Both testified at their depositions that they had not made any decision prior to the administrative hearings. Moreover, despite

37

the pressure from the community and other city officials to impose the maximum penalty of 10 years, the BSS decided to revoke Sullivan's permits for only five years.[14]

Similarly, we find insufficient evidence that James prejudged the case prior to the BPW appeal hearing. The court cited James's remarks during the BPW hearing, particularly his statement that "I don't think it's any surprise – maybe to somebody, but it shouldn't be – where I stand on this." The court found that these remarks "may show pre-judgment on the part of James," and "arguably suggests that he had, prior to the hearing, formed an opinion on the case and in fact communicated it to other persons." We are not persuaded that the court's finding that James's remarks *might* show prejudgment is sufficient to establish the concrete evidence of bias required to overcome the presumption of impartiality. Moreover, we note that these remarks came at the end of the lengthy BPW hearing, during which James (along with several other board members) had actively engaged both Sullivan and the neighbor group with questions and comments. Whether or not James had formed an opinion regarding the appropriate outcome, we conclude that Sullivan failed to present sufficient evidence that he had committed to revoking its permits prior to hearing the evidence at the BPW hearing, or had endeavored to influence any other board members to do the same.

### 3.    *Overlapping roles*

We also agree with the City that the overlapping administrative roles inhabited by Lorenzen and James were permissible and that Sullivan failed to produce evidence of bias arising from those roles. Absent concrete evidence of precommitment, an overlap in administrative roles may be sufficient to establish bias where a decisionmaker is "in the position of reviewing his or

---

[14]    Sullivan contends that the number of years is irrelevant, because any revocation would doom the project under new hillside building ordinances. We disagree—at a minimum, Sullivan would be able to begin any revised project five years earlier than under the maximum penalty. Further, we agree with the City that the imposition of a five-year revocation is relevant to at least partially rebut the suggestion that Lorenzen and James made their decisions in response to political pressure.

her own decision" (*Nightlife Partners v. City of Beverly Hills* (2003) 108 Cal.App.4th 81, 92 (*Nightlife*.)

In *Nightlife*, for example, the court held that the due process rights of a permit applicant were violated when an attorney represented a city in connection with a business permit denial and also advised the hearing officer on the administrative appeal from that denial. As such, the attorney was in a position to advise on legal rulings and evidentiary objections in the adversarial appeal of an initial decision he had helped obtain. (*Nightlife, supra*, 108 Cal.App.4th at pp. 84–85; see also *Golden Day Schools, Inc. v. State Dept. of Education* (2000) 83 Cal.App.4th 695, 710 [due process violation where the same person who initiated the refusal to renew a government contract sat on the appellate panel that reviewed that administrative action, and thus "was in the position of judging the correctness of his own decision"].)

By contrast, "'[t]he mere fact that the decision-maker or its staff is a more active participant in the factfinding process . . . will not render an administrative procedure unconstitutional.'" (*Nightlife, supra*, 108 Cal.App.4th at p. 94, quoting *Howitt v. Superior Court* (1992) 3 Cal.App.4th 1575, 1581.) Here, the evidence that Lorenzen was the principal investigator into the tree removals prior to the BSS hearing and that James was the board member tasked with overseeing the BSS investigation is insufficient to establish their inability to fairly adjudicate the issue. The trial court found that Lorenzen's email communications with James providing status updates about the case and the results of the investigation "*suggest* Lorenzen was looking to James to endorse his upcoming decision" (emphasis added). In addition, the court noted that "[i]f James directed the BSS outcome, he would impermissibly be sitting in judgment of his own decision." However, the court also found that Sullivan "presented no direct evidence James told Lorenzen what decision he should reach." Given the lack of concrete evidence that James in fact directed the BSS's decision, together with Lorenzen's discussion of the BSS decision as one made among members of the BSS following the first hearing, we conclude the trial court erred in determining that James was unable to fairly adjudicate the BPW appeal because of his role during the investigation and BSS hearing.

We are similarly unpersuaded by Sullivan's argument that Lorenzen improperly advised the BPW in connection with the BPW appeal. The copy of the BSS report Lorenzen emailed to James prior to the BPW hearing reflected the BSS's findings and did not indicate any suggestion for how the BPW should proceed. The trial court also expressed concern with the statements made by Repenning during the BPW hearing, finding that those statements "indicate[] that she based her decision in Petitioner's appeal on discussions with 'representatives of the developer and representatives of the community' and Lorenzen." We find those statements insufficient to establish bias by Repenning, in view of her statement that she spoke with all sides of the dispute; moreover, the information she reported receiving from Lorenzen regarding his belief that Sullivan intentionally removed tree number 5 was the same information Lorenzen provided on behalf of the BSS at the start of the BPW appeal hearing.

Sullivan also contends that this court's recent decision in *California DUI Lawyers Association v. California Department of Motor Vehicles* (2022) 77 Cal.App.5th 517 (*CDLA*) applies here. In *CDLA*, we considered a fairness challenge to the administrative hearings conducted by the Department of Motor Vehicles (DMV) regarding suspension of a driver's license after the driver has been arrested for driving under the influence. The DMV admitted that at these hearings, it required the hearing officer to act both as advocate for the DMV and as trier of fact. (*Id*. at p. 527.) Under those circumstances, we concluded that the "hearing structure violates the California and federal due process rights of drivers by combining the advocacy and adjudicatory roles into a single DMV employee." (*Id*. at p. 530.) "The irreconcilable conflict between advocating for the agency on one hand, and being an impartial decisionmaker on the other, presents a '"particular combination of circumstances creating an unacceptable risk of bias."'" (*Id*. at p. 532, quoting *Today's Fresh Start, supra*, 57 Cal.4th at p. 221; *Morongo, supra*, 45 Cal.4th 731, 741.)[15]

---

[15]     *CDLA* was decided after the parties had completed their briefing in this appeal. At our request, the parties submitted supplemental briefs regarding the applicability of *CDLA* to this case.

We disagree with Sullivan that *CDLA* is analogous to this case. As the trial court found, Lorenzen's role was as an investigator and a "decision-maker adjudicating the matter at the Bureau level." Substantial evidence supports that factual determination and we will not disturb it on appeal. Moreover, we find no evidence that Lorenzen also acted as an advocate on behalf of the City during that hearing, nor was he procedurally required to do so, as was the DMV fact-finder in *CDLA*. Similarly, the trial court found that James "participated in the investigatory process leading to the BSS decision, then sat on the appellate panel determining whether that decision should be upheld." Sullivan's contention that James acted as an advocate during the BPW hearing because he questioned the presenters is not supported by any authority. We find that Sullivan has failed to establish that either Lorenzen or James crossed the line into advocacy for the decisions they were also tasked to adjudicate.

In sum, we conclude that Sullivan failed to present "specific evidence demonstrating actual bias or a particular combination of circumstances creating an unacceptable risk of bias" that would meet the standard of the exceptional case involving a constitutionally unacceptable risk of bias. (*Morongo, supra*, 45 Cal.4th at p. 741.) We therefore reverse the trial court's order granting Sullivan's writ petition.

## III.  *Cross-Appeal*

Sullivan's second cause of action sought a writ of mandamus under section 1085 to compel the City to reinstate its grading permits for the properties. Sullivan alleged that even if the City was justified in revoking its building permits pursuant to LAMC section 46.06, that statute did not authorize the City to revoke Sullivan's grading permits. The trial court found that the "City's revocation of grading permits flowed from the administrative decision" under LAMC section 46.06 and further, that Sullivan's contentions regarding its second cause of action were moot once the court issued the administrative writ overturning the revocation of all of Sullivan's permits. Sullivan cross-appealed from the trial court's dismissal of its second cause of action, arguing that the City lacked the authority to revoke its grading permits.

41

"A writ of mandate 'may be issued by any court … to compel the performance of an act which the law specifically enjoins, as a duty resulting from an office, trust, or station. . . .' (Code Civ. Proc., § 1085, subd. (a).) The petitioner must demonstrate the public official or entity had a ministerial duty to perform, and the petitioner had a clear and beneficial right to performance." (*AIDS Healthcare Foundation v. Los Angeles County Dept. of Public Health* (2011) 197 Cal.App.4th 693, 700.)

In reviewing a quasi-legislative decision by an administrative agency, "'"[t]he authority of the court is limited to determining whether the decision of the agency was arbitrary, capricious, entirely lacking in evidentiary support, or unlawfully or procedurally unfair."' [Citations.]" (*Abatti v. Imperial Irrigation District* (2020) 52 Cal.App.5th 236, 250.) "The appellate court reviews the trial court's decision de novo under the same standard." (*Ibid.*, quoting *California Bldg. Industry Ass'n v. San Joaquin Valley Air Pollution Control Dist.* (2009) 178 Cal.App.4th 120, 130; see also *City of Arcadia v. State Water Resources Control Board* (2006) 135 Cal.App.4th 1392, 1409 [review is de novo, "except where the trial court made foundational factual findings, which are binding on appeal if supported by substantial evidence"].)

Sullivan contends that the plain language of LAMC section 46.06 grants authority to the City to revoke building permits but not grading permits. The City responds that because it had authority under that statute to revoke Sullivan's building permits, it could also revoke the associated grading permits. Citing LAMC section 91.7005.1,[16] the City contends that Sullivan could not conduct any grading without building permits.

We find no error in the trial court's conclusion that the City's revocation of grading permits necessarily flowed from the revocation of Sullivan's building permits. Sullivan argues that it is entitled to reinstatement of its original grading permits so that it can "pursue its desired project as it was originally permitted." However, in light of our decision affirming the City's revocation of Sullivan's building permits under LAMC section 46.06, Sullivan has acknowledged that it can no longer pursue the

---

[16]     LAMC section 91.7005.1 provides: "No person shall conduct any grading operation for other than building site development in hillside areas."

original project under current regulations.  Sullivan has not shown that it would be entitled to the same grading permits for a redesigned development project.  We therefore affirm the trial court's dismissal of Sullivan's second cause of action.

## DISPOSITION

The judgment is reversed with respect to Sullivan's first cause of action for writ of administrative mandate under section 1094.5.  The judgment is affirmed as to Sullivan's second cause of action for writ of mandate under section 1085.  The City is entitled to its costs on appeal.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

COLLINS, J.

We concur:

WILLHITE, ACTING P.J.

CURREY, J.